## IN THE DISTRICT COURT OF LOVE COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| **STARK RANCH-WEST, LLC** §<br><br>§<br>**Plaintiff,** §<br><br>§<br>**v.** §<br><br>§<br>**REDI-MIX, LLC and** §<br>**OKLAHOMA CHRISTIAN** §<br>**UNIVERSITY, NORTH CENTRAL** §<br>**TEXAS COLLEGE, UNITED WAY** §<br>**OF COOKE COUNTY, and FROST** §<br>**BANK, AS CO-TRUSTEES OF THE** §<br>**LEO AND MABEL SCOTT** §<br>**CHARITABLE TRUST** §<br><br>§<br>**Defendants.** §| |

Filed In District Court
Love County, OK

**AUG 01 2019**

Kim Jackson, Court Clerk
By_____Deputy

CJ-2019- *29*

### PLAINTIFF'S ORIGINAL PETITION

Stark Ranch-West, LLC ("Stark Ranch") files its Original Petition against Redi-Mix, LLC ("Redi-Mix") and Oklahoma Christian University, North Central Texas College, United Way of Cooke County, and Frost Bank, as Co-Trustees of the Leo and Mabel Scott Charitable Trust (collectively, the "Scott Trust") and respectfully states to the Court as follows:

### I.
### PARTIES

1.  Stark Ranch is a domestic limited liability company organized under the laws of the State of Texas and registered to transact business in the State of Oklahoma.

2.  Redi-Mix is a domestic limited liability company organized under the laws of the State of Texas.  Redi-Mix may be served with process through its registered agent, Corporate Creations Network, Inc., 601 S. Boulder Ave., Suite 600, Tulsa, Oklahoma 74119.

**EXHIBIT**

**2**

3.     Oklahoma Christian University is a Co-Trustee of the Leo and Mabel Scott Charitable Trust. Oklahoma Christin University may be served with process through its registered agent, Stephen Eck, at 2501 East Memorial Rd, in Edmond, Oklahoma 73013.

4.     North Central Texas College is a Co-Trustee of the Leo and Mabel Scott Charitable Trust. North Central Texas College may be served with process through its registered agent, Debbie A. Sharp, at 1525 West California, Gainesville, Texas 76240.

5.     United Way of Cooke County is a Co-Trustee of the Leo and Mabel Scott Charitable Trust. United Way of Cooke County may be served with process through its registered agent, Angie Hare, at 114 E. Main Street, Gainesville, Texas 76240 or at P.O. Box 208, Gainesville, Texas 76241.

6.     Frost Bank is a Co-Trustee of the Leo and Mabel Scott Charitable Trust. Frost Bank may be served with process through its registered agent, Stanley E. McCormick Jr., at 100 West Houston Street, San Antonio, Texas 78205.

## II.
## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over this cause because the amount in controversy is within the Court's jurisdictional limit.

8.     This Court has personal jurisdiction over the defendants because they have done business in Oklahoma and/or have had minimum contacts with Oklahoma such that the maintenance of this lawsuit in Oklahoma does not offend traditional notions of fair play and substantial justice.

9.     Venue is proper in Love County, Oklahoma because this action involves real property located Love County, Oklahoma.

## III.
## STATEMENT OF FACTS

10.     Redi-Mix supplies redi-mixed concrete primarily in the Dallas/Fort Worth Metroplex and North Texas markets. Among other things, Redi-Mix owns and operates a dredging and sand mining operation on the Red River with a processing facility erected on, and adjacent to, the north side of the Red River in Love County, Oklahoma and generally located at 12979 White Rose Road, Thackerville, Oklahoma.

11.     Stark Ranch owns real property generally located on, and adjacent to, the south side of the Red River, which real property is located primarily in Texas and partially in Oklahoma.[1]

12.     The activities involved in this suit concern Redi-Mix's trespass upon the property of Stark Ranch; Redi-Mix's conversion of property (sand) owned by Stark Ranch through Redi-Mix's operation of a sand dredging barge in the Red River; Redi-Mix's excavation into the bank of the Red River and removal of the vegetation and alteration of the then-existing river bank fronting the property owned by Stark Ranch; Redi-Mix's altering the course and flow of the Red River and exacerbating erosion of soil on property owned by Stark Ranch; and Redi-Mix's artificial and unlawful alteration of the legal boundary line of the property owned by Stark Ranch along the Red River.

13.     On or about May 31, 2018, Stark Ranch closed on its purchase of a tract of real property from Paul Parker Yarbrough, Jr. and Joanne Keeter (collectively, "Sellers"). A true and

---

[1]     Pursuant to the Red River Boundary Compact ("Compact"), "the permanent political boundary line between the states of Oklahoma and Texas along the Red River is the vegetation line along the south bank of the Red River . . . ." 74 OK Stat. § 74-6106, Art. II(B). Article II.(A)(1) of the Compact provides in part that the "'[v]egetation line' means the visually identifiable continuous line of vegetation that is adjacent to that portion of the riverbed kept practically bare of vegetation by the natural flow of the river and is continuous with the vegetation beyond the riverbed." Article VII of the Compact provides: "This compact does not change: 1. [t]he title of any person or entity, public or private, to any of the lands adjacent to the Red River; 2. [t]he rights, including riparian rights, if any, of any person or entity, public or private, that exist as a result of the person's or entity's title to land adjacent to the Red River; or 3. [t]he boundaries of those lands."

correct legal description of the real estate purchased from Sellers is attached hereto as **Exhibit "A."** In connection with such transaction, Stark Ranch engaged a licensed state land surveyor and registered professional land surveyor to determine the property's gradient boundary line along the Red River relying on a the well-established and well-publicized survey methodology originally developed in the United States Supreme Court opinion of *State of Oklahoma v. State of Texas*, 260 U.S. 606 (1923)). Such survey revealed that Red-Mix's trespass and mining activities had artificially altered the gradient boundary of the Seller's property along a portion of the Red River. The real property the subject of **Exhibit "A"**, along with the land highlighted in blue on **Exhibit "B"** attached hereto that depicts the artificial alteration of the gradient boundary due to Redi-Mix's trespass, dredging activities, and conversion of sand, are collectively referred to hereafter as the "Property."

14.    As a part of the purchase transaction, the Sellers assigned to Stark Ranch certain causes of action previously owned by Sellers respecting Redi-Mix's activities.

15.    On or about June 3, 2011, a mining lease was executed by and among various parties. A true and correct copy of the original mining lease is attached hereto as **Exhibit "C"** ("Mining Lease"). The Scott Trust was the lessor under the Mining Lease. The Mining Lease was subsequently amended and assigned to Redi-Mix on September 30, 2013, and Redi-Mix thereafter constructed its sand mining and processing facility across the Red River from the Property. A true and correct copy of the Memorandum of Lease Assignment and Amendment of Mining Lease is attached hereto as **Exhibit "D"**.

16.    In or around December 2017, the Sellers first discovered that Redi-Mix was trespassing on the Property and mining and converting sand from the Property. Around this time, Redi-Mix had placed cables on the Property and cleared timber and other vegetation from the

Property without authorization.  Thereafter, on the morning of December 9, 2017, the Sellers placed "No Trespassing" signs on the Property near the bank of the Red River across from Redi-Mix's processing facility, and, that very same morning, Parker Yarbrough objected to Redi-Mix's activities and trespass via an in-person meeting at the Property with a Redi-Mix employee.

17.     Later on the evening of December 9, 2017, Paul Flanagan, who was the Redi-Mix operations manager regarding the facility, sent an e-mail to David Behring, who was the vice-president and regional manager for Redi-Mix's parent company, U.S. Concrete, Inc., with the subject line "Texas – Oklahoma" that attached a November 29, 2017 article regarding a Red River boundary lawsuit involving land owners long the Red River in the Texas counties of Wichita, Wilbarger, and Clay.  A true and correct copy of the December 9, 2017 e-mail is attached hereto as **Exhibit "H"**.  The article references the aforementioned United States Supreme Court opinion of *State of Oklahoma v. State of Texas* and provides that property owners on the south side of the Red River "***own the property up to the gradient boundary line along the southern bank of the [Red] river . . . .***" (emphasis added).  The article also references the Red River Boundary Compact and provides that it does "***not address any changes of ownership of the land at issue – merely how state boundaries (and therefore state authority) would be determined.***" (emphasis added).

18.     Despite the "No Trespass" signs, Parker Yarbrough's objection to Redi-Mix's activities and trespass, and Redi-Mix management having very clearly been put on notice of a substantial issue (which Redi-Mix had a duty to investigate and address prior to conducting any dredging in the Red River in the first place), Red-Mix continued to trespass on the Property, mine sand from the Property, and convert the sand to its own possession, ownership, use, and profit. Indeed, Redi-Mix even caused the Sellers' "No Trespassing" signs to tumble into the Red River as a result of its continued excavation into the bank of the river on the Property.

19.     On or about June 8, 2018 (just 8 days after Stark Ranch closed on the purchase from the Sellers), Steve Schmitz, Vice President of Stark Ranch, left a voicemail on the direct telephone line of Behring requesting that Behring return the call for purposes of discussing Redi-Mix's wrongful trespass and conversion on the Property.

20.     Only after Stark Ranch's legal counsel sent Behring a letter on June 15, 2018 regarding the trespass and conversion did Behring respond with his willingness to converse about the actions Schmitz complained about on behalf of Stark Ranch.

21.     On or about June 21, 2018, Behring met with Schmitz in Gainesville, Texas for purposes of discussing the concerns of Stark Ranch and also to overfly the areas of concern. During the meeting, Schmitz advised Behring that Redi-Mix was trespassing upon the Property and wrongfully converting sand from the Property. Behring requested information regarding the methodology used in determining that Redi-Mix was trespassing on the Property. Schmitz agreed to provide Behring with the requested information.

22.     Following their meeting, Schmitz sent Behring an email on June 25, 2018, whereby he explained to Behring that Stark Ranch engaged a licensed state land surveyor and registered professional land surveyor to determine the Property's gradient boundary line along the Red River. Schmitz further explained that the expert surveyor determined the Property's gradient boundary lines relying on the well-established and well-publicized survey methodology originally developed in the aforementioned United States Supreme Court opinion of *State of Oklahoma v. State of Texas*. A true and correct copy of the June 25, 2018 email is attached as **Exhibit "E."**

23.     Of course, Behring and Redi-Mix were, or should have been, already well aware that the gradient boundary line determined Stark Ranch's property boundary along the Red River. Nonetheless, on July 9, 2018, Behring responded to Schmitz's earlier email, disagreeing with the

surveyor's findings and suggesting that the Red River Boundary Compact, not the surveyor's methodology, should have been used in determining the Property boundary line. A true and correct copy of the July 9, 2018 email is attached as **Exhibit "F."**

24.     On July 18, 2018, Schmitz sent a follow-up email to Behring, explaining that the Red River Boundary Compact did not apply when determining the location of the Property's boundary lines because the text of the compact explicitly states that it does not change or effect title or real property boundaries. A true and correct copy of the July 18, 2018 email is attached as **Exhibit "G."**

25.     Upon receiving no substantive response from Behring, Stark Ranch filed suit against Redi-Mix in Cooke County, Texas on August 17, 2018. Even after Stark Ranch filed suit and served Redi-Mix with process, upon information and belief, Redi-Mix continued to trespass on and mine sand from the Property for a period of time.

## IV.
## CAUSES OF ACTION

## COUNT I: INTENTIONAL AND WILLFUL TRESPASS

## (AGAINST REDI-MIX)

26.     Stark Ranch incorporates by reference all allegations contained above as if fully set forth herein.

27.     Stark Ranch became the owner of the Property when it purchased it from the Sellers on May 31, 2018. In connection with said purchase, Sellers assigned to Stark Ranch their claims and rights to sue, including their right to sue Redi-Mix. Redi-Mix physically, intentionally, and voluntarily trespassed on the Property. More specifically, Redi-Mix entered the Property without authorization and mined sand. Redi-Mix also placed cables on the Property and cleared timber and other vegetation from the Property without authorization.

28.   Redi-Mix knew or should have known that it was entering on the Property and that it was doing so without authorization.  Additionally, and/or alternatively, Redi-Mix trespassed on the Property and/or converted sand therefrom willfully and/or in bad faith.

29.   Redi-Mix's unauthorized, intentional trespass on the Property has caused injury or damage to the Property, the Sellers, and/or Stark Ranch for which Stark Ranch is entitled to recover.  Stark Ranch seeks all damages available under applicable law, including but not limited to damages for cost of restoration or repair, loss of use of the land, loss of expected profits from the use of the land, loss or diminution of market value of land, and/or the intrinsic value of trees and plants.  Further, Stark Ranch seeks damages for the value of the sand and/or the amount of any enhanced value of the sand, without any deduction for any expenses incurred by Redi-Mix in mining or processing it.  Additionally or alternatively, Stark Ranch seeks damages or for any value added to the sand by Redi-Mix's inclusion of the sand in any final product, including but not limited to damages in the full amount of the sales prices or value of any final concrete product sold by Redi-Mix that included the sand.

30.   Further, Stark Ranch seeks exemplary damages from Redi-Mix.

## COUNT II: NEGLIGENT TRESPASS

### (AGAINST REDI-MIX)

31.   Stark Ranch incorporates by reference all allegations contained above as if fully set forth herein.

32.   Additionally, and/or alternatively, Stark Ranch asserts that Redi-Mix owed a duty to Sellers and Stark Ranch to not trespass on the Property.  Redi-Mix entered the Property without authorization.

33.     Redi-Mix breached this duty by failing to ascertain whether or not it was mining on the Property.  Redi-Mix further breached this duty by failing to ascertain whether or not it was deforesting timber and other vegetation from the Property or placing cables on the Property.

34.     Redi-Mix's negligent acts are the proximate cause of damage to the Sellers and/or Stark Ranch, and Stark Ranch seeks all damages available under applicable law, including but not limited to damages for cost of restoration or repair, loss of use of the land, loss of expected profits from the use of the land, loss or diminution of market value of land, the intrinsic value of trees and plants, and/or the value of the sand taken from the Property.

35.     Further, Stark Ranch seeks exemplary damages from Redi-Mix.

## COUNT III: CONVERSION OF SAND

## (AGAINST REDI-MIX)

36.     Stark Ranch incorporates by reference all allegations contained above as if fully set forth herein.

37.     The Sellers and/or Stark Ranch owned Property and the sand thereon.  Redi-Mix intentionally and wrongfully exercised dominion and control over, and took possession of, sand on the Property without the Sellers' or Stark Ranch's consent.  The Sellers and Stark Ranch have suffered injury as a result of Redi-Mix's conduct.

38.     Accordingly, Stark Ranch seeks all damages available under applicable law, including but not limited to damages for the value of the sand and/or the amount of any enhanced value of the sand, without any deduction for any expenses incurred by Redi-Mix in mining or processing it.  Additionally or alternatively, Stark Ranch seeks damages or for any value added to the sand by Redi-Mix's inclusion of the sand in any final product, including but not limited to damages in the full amount of the sales prices or value of any final concrete product sold by Redi-

Mix that included the sand. Additionally, and/or alternatively, Stark Ranch seeks any and all damages or remedies available under Okla. Stat. tit. 23 § 23-64.

39. Further, Stark Ranch seeks exemplary damages from Redi-Mix.

## COUNT IV: REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF

## (AGAINST REDI-MIX AND THE SCOTT TRUST)

40. Stark Ranch incorporates by reference all allegations contained above as if fully set forth herein.

41. Pursuant to Okla. Stat. tit. 12 § 1651 *et. seq.*, Stark Ranch requests the Court to enter a declaratory judgment declaring, in whole or in part, one or more of the following:

> The Red River Boundary Compact does not apply to the determination of the legal boundary of the Property because the Compact explicitly states that it does change: the title of any person or entity, public or private, to any of the lands adjacent to the Red River; the rights, including riparian rights, if any, of any person or entity, public or private, that exist as a result of the person's or entity's title to land adjacent to the Red River; or the boundaries of those lands.

42. A controversy exists between the Stark Ranch and Redi-Mix as to whether the Red River Boundary Compact applies in determining the Property's boundary lines. Stark Ranch seeks these declarations in order to afford it relief regarding the dispute with respect to the compact's application to this matter.

43. Because the Scott Trust is the lessor under the Mining Lease, as amended, and has interests that may or would be affected by the declaration (Okla. Stat. tit. 12 § 1653(A)), Stark Ranch joins the Scott Trust for purposes of its claim for declaratory judgment.

44. The Plaintiff would ask this Court to enter such injunctive relief as is appropriate to carry out the declaratory judgment as is appropriate under the circumstances.

## V.
## REQUEST FOR ATTORNEYS' FEES, EXPENSES, AND INTEREST

### (AGAINST REDI-MIX)

45.     Stark Ranch incorporates by reference all allegations contained above as if fully set forth herein.

46.     Pursuant to applicable law, including but not limited to Okla. Stat. tit. 12 § 940 and Okla. Stat. tit. 23 § 23.64, Stark Ranch is entitled to recover from Redi-Mix reasonable and necessary attorneys' fees, court costs, interest, and expenses in pursuing this action, and Stark Ranch seeks recovery of same.

## VI.
## CONDITIONS PRECEDENT

47.     All conditions precedent to recovery for the relief sought herein have been performed, have occurred, or have been satisfied.

## VII.
## PRAYER

WHEREFORE, Plaintiff Stark Ranch requests that Defendants be cited to appear and answer herein and, upon final trial of this cause, the Court enter a judgment in favor of Stark Ranch against Redi-Mix for the following:

a.     Declaratory relief as requested herein together with such appropriate injunctive relief as is necessary to enforce same;

b.     Judgment against Redi-Mix for damages in an amount proven at trial or hearing within this Court's jurisdictional limits;

c.     Pre-and post-judgment interest as allowed by law;

d.     Reasonable and necessary attorneys' fees;

e.     Court costs;

f.     Such other and further relief to which Stark Ranch may be justly entitled.

STARK RANCH-WEST, LLC, PLAINTIFF

BY: _____

     Kenneth A. Delashaw, Jr.,
     OBA 2283
     P. O. Box 328 Marietta, OK 73448
     (580) 276-3136
     ATTORNEY FOR PLAINTIFF

# EXHIBIT "A"

Doc
00083601  Bk OPR  Vol 2197  Pg 464

## Exhibit "A"

Tract One:

FIELD NOTES TO 2022.20 ACRES IN THE B.B.B. & C.R.R. CO. SURVEY ABSTRACT 156,
ET AL, COOKE COUNTY, TEXAS

All that certain tract or parcel of land situated in the B.B.B. & C.R.R. Co.
Survey Abstract 156, the J.P. Havins Survey Abstract 455, the C. Hart Survey
Abstract 461, the S.B. Murrell Survey Abstract 1420, the W.H. Donham Survey
Abstract 1479, the B.B.B. & C.R.R. Co. Survey Abstract 177, the S.E. Clements
Survey Abstract 264, the R. McFall Survey Abstract 674, the J.N. Wright
Survey Abstract 1535, the J.G. Jones Survey Abstract 1206, the A. Elston
Survey Abstract 351, the J.S.H. Donham Survey Abstract 1244, the C.E. Fallis
Survey Abstract 1516, the S.B. Murrell Survey Abstract 1491, the David Smith
Survey Abstract 173, the Thomas Wright Survey Abstract 1156, the
B. A. Stanford Survey Abstract 1445, the A. Hodge Survey Abstract 1388, the
J.N. Murrell Survey Abstract 1525, the B.C. Forbes Survey Abstract 1614, the
V.A. Howeth Survey Abstract 1631, the McKinney and Williams Survey Abstract
755, and the Jacob Spears Survey Abstract 915, Cooke County, Texas, being all
of a called 1546 acre tract conveyed by Laura Josephine Jones to Frances
Yarbrough by deed recorded in Volume 325, page 110 of the Cooke County Deed
Records, being a part of a called 530 acre tract described in a deed from
Laura Josephine Jones to Frances Yarbrough recorded in Volume 371, page 3 of
said Deed Records, and being all of a 0.91 acre tract conveyed by Robert T.
Lewis, et ux to Paul Yarbrough, et ux by deed recorded in Volume 719, page
629 of said Deed Records, and being more particularly described as follows:

BEGINNING at a set steel pin on the West line of said 530 acre tract located
North 00 degrees 06 minutes 46 seconds West, a distance of 62.31 feet from
the Southwest corner of said 530 acre tract, on the Northwesterly line of
F.M. Road 1202 which was the right-of-way for McKinley Avenue during the Camp
Howze period, and was granted by the USA to Cooke County by deed recorded in
Volume 322, page 114 of said Deed Records, said point also being the
Southeast corner of a tract conveyed to Mollie Eaton by deed recorded in
Volume 1448, page 314 of the Cooke County Official Public Records;

THENCE North 00 degrees 06 minutes 46 seconds West, with the West line of
said Yarbrough tract, along and near a fence, passing the Northeast corner of
said Mollie Eaton tract, same being a Southeast corner of a tract described
in a deed to Karl Trubenbach Land LP recorded in Volume 2049, page 702 of the
Cooke County Official Public Records, continuing and passing the Northwest
corner of said 530 acre tract, same being the Southwest corner of said 1546
acre tract, continuing with the West line of said 1546 acre tract and passing
a Northeast corner of said Trubenbach Land LP, same being the Southeast
corner of a tract described in a deed to James Martin Lewis recorded in
Volume 866, page 141 of said Deed Records, continuing with said West line of
Yarbrough tract and the East line of previously said Lewis tract, and passing
the Lewis tract's Northeast corner, common to the Southeast corner of a tract
described as Exhibit C in a deed to Robert Lewis, III recorded in said Volume
866, page 141 of said Deed Records, continuing and passing the Westernmost
Northwest corner and the North corner of said 0.91 acre tract, (said North
corner being on the Northeast line of a called 20.89 acre tract described in
a deed from W.P. Clements, Jr., Governor of the State of Texas, et al to
Robert T. Lewis, Jr., et ux recorded in Volume 666, page 421 of said Deed
Records), continuing and passing the Northeast corner of said Robert Lewis
tract, common to the Southeast corner of a tract described in a deed to
F. Michael Sparks recorded in Volume 1404, page 169 of said Public Records,
continuing with said common line a total distance of 13,649.55 feet to a
square pipe found at a fence corner at the Northeast corner of said Sparks
tract, common to the Southeast corner of a tract conveyed to Ken Fomby by
deed recorded in Volume 1139, page 603 of said Public Records;

THENCE North 00 degrees 08 minutes 28 seconds West, along and near a fence,
continuing with the West line of said Yarbrough tract, a distance of
5629.45 feet to a wooden fence corner at the Northwest corner of said 1546 acre
tract, on the North line of said Wright Survey, common to the South line of
the T. Booker Survey Abstract 72;

**EXHIBIT A**

Doc
00083601

Bk
OPR

Vol
2197

Pg
465

BBB & CRR Co Su
2022.20 ac. tr.
Abstract 156, et al

Pg. 2 of 3

THENCE South 89 degrees 24 minutes 42 seconds East, with said common survey
line, along a fence, a distance of 267.14 feet to the Northwest corner of
said Jones Survey, common to the Northeast corner of said Wright Survey and
said Yarbrough tract;

THENCE Southeasterly, with the East line of said Yarbrough tract and the
South bank of said Red River as evidenced by the calls in the various survey
patents which bounds the Red River in the Yarbrough deed, the following
courses and distances:
   South 34 degrees 41 minutes 44 seconds East, a distance of 151.47 feet;
   South 25 degrees 43 minutes 04 seconds East, a distance of 172.40 feet;
   South 33 degrees 01 minute 58 seconds East, a distance of 250.53 feet;
   South 22 degrees 36 minutes 13 seconds East, a distance of 265.49 feet;
   South 43 degrees 47 minutes 51 seconds East, a distance of 1181.31 feet;
   South 34 degrees 06 minutes 03 seconds East, a distance of 700.18 feet;
   South 41 degrees 25 minutes 24 seconds East, a distance of 1083.85 feet;
   South 39 degrees 56 minutes 49 seconds East, passing the Southeast corner
   of said Jones Survey, common to the Northwest corner of said Elston
   Survey and continuing a total distance of 698.65 feet;
   South 36 degrees 32 minutes 15 seconds East, a distance of 340.94 feet;
   South 38 degrees 45 minutes 04 seconds East, a distance of 193.10 feet;
   South 39 degrees 00 minutes 39 seconds East, a distance of 889.95 feet
   to a corner on the gradient boundary of the Red River as surveyed by
   Nedra Foster, LSLS on February 2018;

THENCE continuing along the gradient boundary the following calls and
distances;
   South 39 degrees 32 minutes 10 second East, a distance of 385.33 feet
   South 36 degrees 08 minutes 07 seconds East, a distance of 234.02 feet;
   South 38 degrees 10 minutes 44 seconds East, passing the Northeast corner
   of said Elston Survey, common to the North corner of said Smith Survey
   and continuing a total distance of 297.68 feet;
   South 35 degrees 37 minutes 50 seconds East, a distance of 286.67 feet;
   South 35 degrees 41 minutes 43 seconds East, a distance of 253.65 feet;
   South 34 degrees 19 minutes 49 seconds East, a distance of 148.95 feet;
   South 42 degrees 22 minutes 03 seconds East, a distance of 123.17 feet;
   South 43 degrees 37 minutes 31 seconds East, a distance of 265.24 feet;
   South 45 degrees 34 minutes 58 seconds East, a distance of 208.61 feet;
   South 47 degrees 46 minutes 27 seconds East, a distance of 321.40 feet;
   South 52 degrees 07 minutes 30 seconds East, a distance of 262.24 feet;
   South 60 degrees 46 minutes 51 seconds East, a distance of 67.60 feet;
   South 66 degrees 06 minutes 17 seconds East, a distance of 172.92 feet
   to the Northeast corner of said Yarbrough tract, on the West line of the
   G.C. & S.F. Railroad;

THENCE Southerly, with the East line of said Yarbrough tract, common to the
West line of said railroad, the following courses and distances:
   South 36 degrees 08 minutes 23 seconds West, a distance of 546.05 feet
   to a set steel pin at the beginning of a curve;
   Southwesterly, 1767.07 feet along a curve to the left having a radius
   of 1985.08 feet and a chord of South 10 degrees 38 minutes 08 seconds
   West, a distance of 1709.47 feet to a set steel pin at the end of said
   curve;
   South 14 degrees 52 minutes 08 seconds East, a distance of 500.86 feet
   to a set steel pin at the beginning of a curve;
   Southeasterly, 598.85 feet along a curve to the right having a radius of
   1835.08 feet and a chord of South 05 degrees 31 minutes 08 seconds East,
   a distance of 596.27 feet to a set steel pin at the end of said curve;
   South 03 degrees 49 minutes 52 seconds West, a distance of 1893.14 feet
   to a set steel pin at the beginning of a curve;
   Southeasterly, 641.36 feet along a curve to the left having a radius
   of 2939.93 feet and a chord of South 02 degrees 25 minutes 08 seconds
   East, a distance of 640.12 feet to a set steel pin at the end of said
   curve;
   South 08 degrees 40 minutes 08 seconds East, a distance of 504.80 feet
   to a set steel pin at the beginning of a curve;

**EXHIBIT A**

Doc
00083601    BK
OPR          Vol      Pg
            2197      426

BBB & CRR Co Su
2022.20 ac. tr.
Abstract 156, et al                                    Pg. 3 of 3

Southeasterly, 722.25 feet along a curve to the right having a radius
of 2789.93 feet and a chord of South 01 degree 15 minutes 08 seconds
East, a distance of 720.27 feet to a set steel pin at the end of said
curve;
South 06 degrees 09 minutes 52 seconds West, a distance of 2316.98 feet
to a set steel pin at the beginning of a curve;
Southeasterly, 692.67 feet along a curve to the left having a radius of
2939.93 feet and a chord of South 00 degrees 35 minutes 08 seconds East,
a distance of 691.10 feet to a set steel pin at the end of said curve;
South 07 degrees 20 minutes 08 seconds East, a distance of 1842.51 feet
to a set steel pin at the beginning of a curve;
Southeasterly, 689.79 feet along a curve to the right having a radius
of 2789.93 feet and a chord of South 00 degrees 15 minutes 08 seconds
East, a distance of 688.07 feet to a set steel pin at the end of said
curve;
South 06 degrees 49 minutes 52 seconds West, a distance of 283.34 feet
to a set steel pin at a fence corner at the Southeast corner of said
Yarbrough tract;

THENCE North 87 degrees 39 minutes 26 seconds West, with the South line
of said tract, a distance of 5384.51 feet to a set steel pin on the
Northeastern line of said F.M. Road 1202;

THENCE North 25 degrees 30 minutes 43 seconds West, with said Northeastern
line, crossing an access easement roadway, and continuing a total distance
of 80.97 feet to a set steel pin near a power pole;

THENCE South 64 degrees 22 minutes 17 seconds West, with the Northwestern
line of said F.M. Road 1202, a distance of 19.91 feet to the point of
beginning containing 2022.20 acres of land.

15860-5

**EXHIBIT A**

Doc
00083601    Bk
OPR          Vol
2197    Pg
487

**LESS AND EXCEPT THE FOLLOWING TRACT:**

FIELD NOTES TO 29.71 ACRES IN THE JACOB SPEARS SURVEY ABSTRACT 915,
ET AL, COOKE COUNTY, TEXAS

All that certain tract or parcel of land situated in the V.A. Howeth
Survey Abstract 1631, and the Jacob Spears Survey Abstract 915, Cooke
County, Texas, being all of a called 30 acre tract described in a deed
from A. M. Burch to Gainesville Gun & Rod Club recorded in Volume 82,
page 131 of the Cooke County Deed Records, and being more particularly
described as follows:

BEGINNING at a set steel pin in a found pile of stone at the South corner
of said 30 acre tract, said corner being located North 87 degrees
39 minutes 26 seconds West a distance of 1715.30 feet and North 02 degrees
20 minutes 34 seconds East a distance of 6.92 feet from the Southeast
corner of a tract described in a deed to Frances Yarbrough recorded in
Volume 325, page 110 of said Deed Records;

THENCE North 18 degrees 01 minute 19 seconds West, near a fence, a
distance of 773.25 feet to a set steel pin in a found pile of stone at the
Northwest corner of said 30 acre tract;

THENCE North 73 degrees 43 minutes 59 seconds East, near a fence partway,
a distance of 1866.33 feet to a set steel pin in a found pile of stone at
the Northeast corner of said 30 acre tract;

THENCE South 13 degrees 57 minutes 34 seconds East, along and near a
fence, a distance of 437.53 feet to a set steel pin at the Easternmost
Southeast corner of said 30 acre tract;

THENCE South 25 degrees 51 minutes 21 seconds West, a distance of
313.39 feet to a set steel pin at the Southernmost Southeast corner
of said 30 acre tract;

THENCE South 70 degrees 04 minutes 27 seconds West, with the South line
of said 30 acre tract, a distance of 1618.14 feet to the point of
beginning containing 29.71 acres of land.

GAINESVILLE GUN & ROD CLUB

**EXHIBIT A**

Doc 00083601   Bk OPR   Vol 2197   Pg 468

**LESS AND EXCEPT THE FOLLOWING TRACT:**

FIELD NOTES TO 11.41 ACRES IN THE B.B.B. & C.R.R. CO. SURVEY ABSTRACT 156, ET AL, COOKE COUNTY, TEXAS

All that certain tract or parcel of land situated in the B.B.B. & C.R.R. Co. Survey Abstract 156 and the J. P. Havins Survey Abstract 455, Cooke County, Texas, being all of a tract described as Water Well Site No. 2 in a deed from The United States of America to the City of Gainesville recorded in Volume 366, page 625 of the Cooke County Deed Records, and all of a tract conveyed by Parker Yarbrough, et al to City of Gainesville by deed recorded in Volume 1081, page 331 of the Cooke County Official Public Records and being more particularly described as follows:

BEGINNING at a found steel pin at the Northwest corner of said Water Well Site No. 2, said beginning corner further being located North 00 degrees 06 minutes 46 seconds West, a distance of 770.21 feet and North 89 degrees 53 minutes 14 seconds East, a distance of 141.14 feet from the Southwest corner of a tract described in a deed to Frances Yarbrough recorded in Volume 371, page 3 of said Deed Records;

THENCE North 64 degrees 30 minutes 33 seconds East, with the North line of said Water Well Site No. 2, a distance of 77.28 feet to a found steel pin at a West corner of said Yarbrough to City of Gainesville tract;

THENCE North 25 degrees 27 minutes 13 seconds East, a distance of 454.63 feet to a found steel pin at the Northernmost Northwest corner of said Yarbrough to City of Gainesville tract;

THENCE North 69 degrees 31 minutes 59 seconds East, a distance of 478.58 feet to a found steel pin at the Northeast corner of said Yarbrough to City of Gainesville tract;

THENCE South 20 degrees 21 minutes 59 seconds East, a distance of 654.74 feet to a found steel pin at the Southeast corner of said Yarbrough to City of Gainesville tract;

THENCE South 69 degrees 37 minutes 25 seconds West, a distance of 673.56 feet to a fence corner at the Southernmost Southwest corner of said Yarbrough to City of Gainesville tract, common to the Southeast corner of said Water Well Site No. 2;

THENCE South 64 degrees 38 minutes 26 seconds West, with the South line of said Water Well Site No. 2, a distance of 178.00 feet to a found steel pin at the Southwest corner of said Water Well Site No. 2;

THENCE North 25 degrees 26 minutes 27 seconds West, a distance of 347.14 feet to the point of beginning containing 11.41 acres of land.

CITY OF GAINESVILLE WATER WELL SITE NO. 2

**EXHIBIT A**

Doc
00083601   Bk
OPR   Vol
2197   Pg
429

# Exhibit "A"

Tract Two:

FIELD NOTES TO 133.77 ACRES OF ACCRETED LAND IN COOKE COUNTY, TEXAS

All that certain tract or parcel of land situated in Cooke County, Texas being accreted land lying between the patented land of the J.G. Jones Survey Abstract 1206 and the A. Elston Survey Abstract 351 and the present Gradient Boundary of the Red River as surveyed by Nedra Foster, LSLS on February 2018 and being more particularly described as follows:

BEGINNING at a set capped steel pin at the Northwest corner of the said Jones Survey, common to the Northeast corner of the J. N. Wright Survey Abstract 1535, on the South line of the T. Booker Survey Abstract 72, at the Northernmost Northeast corner of a 1546 acre tract of land conveyed by Laura Josephine Jones to Frances Yarbrough by deed recorded in Volume 325, page 110 of the Cooke County Deed Records;

THENCE South 89 degrees 24 minutes 42 seconds East, with the projected North line of said Booker Survey, a distance of 1482.97 feet to a corner on the said Gradient Boundary on the Red River as surveyed by Nedra Foster, LSLS on February, 2018;

THENCE Southeasterly, along said gradient boundary, the following courses and distances:
South 53 degrees 58 minutes 21 seconds East for a distance of 91.40 feet to a corner;
South 45 degrees 17 minutes 03 seconds East for a distance of 427.80 feet to a corner;
South 60 degrees 28 minutes 15 seconds East for a distance of 691.87 feet to a corner;
South 27 degrees 10 minutes 46 seconds East for a distance of 834.10 feet to a corner;
South 27 degrees 24 minutes 53 seconds East for a distance of 784.05 feet to a corner;
South 42 degrees 03 minutes 52 seconds East for a distance of 110.45 feet to a corner;
South 24 degrees 14 minutes 12 seconds East for a distance of 297.20 feet to a corner;
South 18 degrees 40 minutes 36 seconds East for a distance of 299.79 feet to a corner;
South 11 degrees 16 minutes 26 seconds East for a distance of 312.02 feet to a corner;
South 00 degrees 25 minutes 20 seconds West for a distance of 407.01 feet to a corner;
South 66 degrees 22 minutes 14 seconds West for a distance of 52.39 feet to a corner;
North 89 degrees 32 minutes 43 seconds West for a distance of 126.00 feet to a corner;
North 24 degrees 20 minutes 28 seconds West for a distance of 46.10 feet to a corner;
South 60 degrees 48 minutes 09 seconds West for a distance of 38.95 feet to a corner;
South 45 degrees 59 minutes 16 seconds West for a distance of 82.04 feet to a corner;
South 31 degrees 17 minutes 35 seconds West for a distance of 59.68 feet to a corner;
South 06 degrees 34 minutes 55 seconds East for a distance of 52.35 feet to a corner;
South 63 degrees 26 minutes 06 seconds East for a distance of 35.78 feet to a corner;
South 04 degrees 14 minutes 11 seconds West for a distance of 27.07 feet to a corner;
South 57 degrees 22 minutes 51 seconds West for a distance of 29.68 feet to a corner;
South 05 degrees 11 minutes 40 seconds East for a distance of 22.09 feet to a corner;

**EXHIBIT A**

Accreted land

Doc
00083601
Bk
OPR
pg. 2 of 2
Vol
2197
Pg
470

South 48 degrees 27 minutes 24 seconds East for a distance of 105.55 feet to a corner;

South 35 degrees 45 minutes 14 seconds West for a distance of 30.81 feet to a corner;

South 06 degrees 06 minutes 56 seconds East for a distance of 84.48 feet to a corner;

South 36 degrees 15 minutes 14 seconds East for a distance of 37.20 feet to a corner;

South 72 degrees 15 minutes 19 seconds East for a distance of 78.75 feet to a corner;

South 33 degrees 06 minutes 41 seconds West for a distance of 82.38 feet to a corner;

South 15 degrees 31 minutes 27 seconds East for a distance of 37.36 feet to a corner;

South 40 degrees 14 minutes 11 seconds East for a distance of 85.15 feet to a corner;

South 55 degrees 54 minutes 18 seconds East for a distance of 78.49 feet to a corner;

South 24 degrees 23 minutes 58 seconds East for a distance of 106.51 feet to a corner;

South 62 degrees 48 minutes 07 seconds East for a distance of 80.95 feet to a corner;

South 10 degrees 22 minutes 33 seconds East for a distance of 72.18 feet to a corner;

South 45 degrees 00 minutes 00 seconds East for a distance of 43.84 feet to a corner;

South 39 degrees 24 minutes 02 seconds East for a distance of 72.47 feet to a corner;

South 63 degrees 01 minutes 11 seconds East for a distance of 61.72 feet to a corner;

South 51 degrees 06 minutes 56 seconds East for a distance of 39.82 feet to a corner;

South 21 degrees 57 minutes 38 seconds East for a distance of 66.85 feet to a corner;

South 16 degrees 19 minutes 37 seconds East for a distance of 206.32 feet to a corner;

South 12 degrees 01 minutes 50 seconds East for a distance of 62.37 feet to a corner;

South 65 degrees 46 minutes 20 seconds West for a distance of 21.93 feet to a corner on the Northeast line of the A. Elston Survey Abstract 351, common to the Northeast line of said Jones to Yarbrough tract;

Northwesterly, with the Northeasterly line of said Elston Survey and the J. G. Jones Survey Abstract 1206 as patented the following courses and distances:

North 42 degrees 55 minutes 30 seconds West for a distance of 310.24 feet to a corner;

North 39 degrees 00 minutes 39 seconds West for a distance of 889.95 feet to a corner;

North 38 degrees 45 minutes 04 seconds West for a distance of 193.10 feet to a corner;

North 36 degrees 32 minutes 15 seconds West for a distance of 340.94 feet to a corner;

North 39 degrees 56 minutes 49 seconds West for a distance of 698.65 feet to a corner;

North 41 degrees 25 minutes 24 seconds West for a distance of 1083.85 feet to a corner;

North 34 degrees 06 minutes 03 seconds West for a distance of 700.18 feet to a corner;

North 43 degrees 47 minutes 51 seconds West for a distance of 1181.31 feet to a corner;

North 22 degrees 36 minutes 13 seconds West for a distance of 265.49 feet to a corner;

North 33 degrees 01 minute 58 seconds West for a distance of 250.53 feet to a corner;

North 25 degrees 43 minutes 04 seconds West for a distance of 172.40 feet to a corner;

North 34 degrees 41 minutes 44 seconds West for a distance of 151.47 feet to the point of beginning and containing 133.77 acres of land.

15860-4.leg

**EXHIBIT A**

# EXHIBIT

# "B"



# EXHIBIT "C"

## MINING LEASE

THIS MINING LEASE (this "Lease") is executed as of June 3, 2011, by and among OKLAHOMA CHRISTIAN UNIVERSITY, NORTH CENTRAL TEXAS COLLEGE, UNITED WAY OF COOKE COUNTY and THE FROST NATIONAL BANK, as Co-Trustees of the LEO and MABEL SCOTT CHARITABLE TRUST ("Lessor"), and CHARLES N. DAVIS, III ("Lessee").

### RECITALS:

A.    Lessor is the owner of certain real property in Love County, Oklahoma, which is described in Exhibit A to this Lease (the "Leased Premises").

B.    Lessor desires to lease to Lessee, and Lessee desires to lease from Lessor, the Leased Premises for certain mining and related purposes, as more particularly set forth in this Lease.

ACCORDINGLY, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee agree as follows:

1.    <u>Lease</u>. Lessor hereby leases and demises to Lessee, and Lessee hereby leases and lets from Lessor, the Leased Premises, subject to all liens, easements and other encumbrances of record affecting the Leased Premises, for the exclusive right to prospect, explore for, mine, process, produce, store, remove and sell therefrom, all minerals and construction materials, including sand, soil, gravel and limestone, but excluding oil and/or gas, said minerals and construction materials being herein collectively referred to collectively as the "Materials," and the right of ingress and egress for such purposes.  As part of such prospecting, mining and production, Lessee shall have the following rights, so long as they are exercised in accordance with the provisions of this Lease:

(a)    The right to remove, process, store, transport, market, sell and otherwise deal with the Materials.

(b)    The right to enter the Property at the gate from old highway 77 that joins highway I-35 and the nonexclusive right to use existing roadways crossing the Property between such gate and the Leased Premises for purposes of ingress and egress to and from the Leased Premises and transportation of Materials from the Leased Premises.

(c)    The right to deposit on the surface of Leased Premises such Materials as may be produced from Lessee's operations under this Lease.

(d)    The right to place on the Property machinery, equipment, structures and other improvements necessary for the mining and selling of Materials mined, together with water lines and other installations as more specifically set forth in Section 6 hereof.

2.    <u>Term</u>. The term of this Lease shall be five (5) years (the "Primary Term"), commencing on the date hereof and expiring on the fifth (5th) anniversary of the date hereof and continuing thereafter for so long as Materials are mined and removed from the Leased Premises



13.1

in Commercial Quantities (as hereinafter defined), unless sooner terminated in accordance with the terms of this Lease. The 12 month period commencing on the commencement date of this Lease, and each 12 month period commencing on an anniversary of the date hereof, is referred to herein as a "Lease Year." For purposes of this Section 2, the term "Commercial Quantities" shall mean mining and removal of not less than One Hundred Thousand (100,000) Tons of Materials during each Lease Year.

3.   Royalties.

(a)   Advance Royalties: Lessee has contemporaneously with the execution and delivery of this Lease, paid to Lessor the sum of Two Thousand Dollars ($2,000) as advance royalty ("the Initial Advance Royalty"). Lessee agrees to pay to Lessor, as advance royalty, on the dates set forth below the following Advance Royalties:

| Anniversary Date | Advance Royalty |
|---|---|
| Execution | $2,000.00 |
| June 3, 2012 or sooner upon obtaining all required mining permits | $20,000.00 |
| June 3, 2013 | $30,000.00 |
| June 3, 2014 | $40,000.00 |
| June 3, 2015 | $50,000.00 |
| June 3, 2016 | $60,000.00 |

Each of such payments being herein called an "Advance Royalty Payment," such Advance Royalty Payments and the Initial Advance Royalty being herein collectively called "Advance Royalties". Lessee may deduct from the Advance Royalties payable under this paragraph the amount of all Tonnage Royalties (as hereinafter defined) theretofore actually paid to Lessor which have not previously been deducted from Advance Royalties.

(b)   Tonnage Royalties.

(i)   Lessee will pay to Lessor, on or before the twentieth (20th) day of each calendar month, a royalty equal to the greater of (i) Sixty Five Cents ($0.65) per Ton (a "Ton" as used herein being 2,000 pounds) or (ii) Twelve and One-Half Percent (12.5%) of the Average Local Sales Price (as hereinafter defined) on all Materials (except Flume Sand and Select Fill) mined and removed from the Leased Premises during the preceding calendar month (each such payment being herein called a "Tonnage Royalty Payment," such Tonnage Royalty Payments being herein collectively called "Tonnage Royalties"). Lessee may deduct from the Tonnage Royalties payable under this paragraph the amount of all Advance Royalties theretofore actually paid to Lessor which have not previously been deducted from Tonnage Royalties.

Page 2

13.2

(ii)     Lessee will pay to Lessor, on or before the twentieth (20th) day of each calendar month, a royalty equal to the greater of (i) Twenty Five Cents ($0.25) per Ton or (ii) Twelve and One-Half Percent (12.5%) of the Average Local Sales Price on all Flume Sand and Select Fill (as hereinafter defined) mined and removed from the Leased Premises during the preceding calendar month (each such payment being herein called a "Tonnage Royalty Payment," such Tonnage Royalty Payments being herein collectively called "Tonnage Royalties"). Lessee may deduct from the Tonnage Royalties payable under this paragraph the amount of all Advance Royalties theretofore actually paid to Lessor which have not previously been deducted from Tonnage Royalties.

(iii)     The term "Average Local Sales Price" shall mean the price at which Materials of comparable type and quality are purchased and sold between unrelated parties in the same geographic area as the Leased Premises for delivery into the Dallas/Fort Worth area. The terms "Flume Sand" and "Select Fill" shall mean materials from either a pit run or after processing with a minimum of fifty percent (50%) of these materials passing through a # 50 sieve.

(v)     Processing Royalties. If Lessee shall construct a plant for the processing of Materials on the Leased Premises mined on a property other than the Leased Premises, Lessee shall pay to Lessor monthly Processing Royalties equal to $0.05 per ton of Materials processed on and sold from the Leased Premises. Such payment shall be made together with payments of Tonnage Royalties.

All payments required under this Section 3 are herein called "Royalties." All Royalties owing hereunder shall be paid to Lessor at the address shown at the beginning of this Lease, or to such different address as Lessor shall have designated by written notice sent in accordance with the notice provisions of this Lease. If any Royalties are not paid in full by the time designated in this Section 3, such past due Royalties shall bear interest at the rate equal to the lesser of eighteen percent (18%) per annum or the highest rate allowed by law for the period beginning on the due date of such Royalties and ending on the date such Royalties are actually paid to Lessor.

4.     Material Removal Records. Lessee agrees to maintain at its business offices, at all times, written records of the amount and type of Material, Flume Sand and Select Fill removed from Leases Premises and shall have a record specifying the amount and type of Material, Flume Sand and Select Fill removed, the driver, the scale ticket, the date of each load of Material, Flume Sand and Select Fill removed from the Leased Premises, including a daily recap sheet and such record shall be available for review by Lessor or Lessor's agents during normal business hours for the purpose of verifying such amounts. Lessee shall also maintain records adequate for Lessor to determine the Average Local Sales Price for all Material, Flume Sand and Select Fill for each month during the term of this Lease. Lessor shall have the right at all times to enter on and to inspect all operations during normal business hours. During mining or processing operations, Lessor will be accompanied by Lessee's representatives. In addition, Lessee shall furnish Lessor a copy of such records along with each monthly payment for Material.

5.     Mining Development Plan.   Lessee shall conduct its mining operations on the Leased Premises in accordance with a mining plan approved in writing by Lessor, such approval not to be unreasonably withheld.  Such mining plan shall (i) describe the methods and timing of intended mining, (ii) indicate the areas of the Leased Premises in which mining activities are to be conducted, (iii) show the direction in which mining is to progress, (iv) contain a plat setting forth any proposed plant location, (v) contain a plat of the area to be mined and lays of mining operations, (vi) show all proposed roads and road locations and (vii) show the location of commencement of mining and the progression of mining operations.  The mining plan shall limit mining to areas which comply with any and all boundary setback requirements of applicable local, state or federal law.   Lessee shall provide to Lessor a copy of all evaluation materials produced or obtained as part of its review and evaluation of the property, including, but not limited to, all core samples and feasibility studies.

6.     Lessee Rights.  Lessee shall have the right of ingress and egress at all times across the Leased Premises as set forth in paragraph (b) of Section 1 hereof and Lessee may construct a roadway across the Leased Premises at no expense to the Lessor, as well as roadways on each unit of the Leased Premises being developed, and Lessee may use sand and gravel mined from the Leased Premises in the construction of the roads at no expense to Lessee.  It is agreed that any improvements on the roads shall remain the property of the Lessor on the termination of this Lease, whether such improvements are made permanent or temporary.  Lessee may place on the property any and all machinery, equipment, structures, and other improvements which will be necessary, or convenient, for the use of mining and selling of Material mined from the Leased Premises, provided that it is working or in working condition or will be used in mining operations.  Salvage equipment shall be removed from the Leased Premises.  Lessee may also lay all necessary water lines and construct power lines for pumping or plant operations and do all other things reasonable and necessary on the Leased Premises to mine the Materials.  In addition, Lessee may build dams to impound water necessary for the proper washing of the Materials and may dig channels to secure drainage from the Leased Premises.  It is further agreed that all such machinery, equipment, structures, and other equipment placed on the Leased Premises except those placed in the roadway, waterways, and electrical lines shall remain personal property and shall not be considered a part of the realty, as by attachment to the soil, and such machinery, equipment, structures, and other improvements maybe removed upon the expiration of the Term hereof, provided that the Lessee is not in default in any of the payments or other covenants, provided herein.

7.     Non-Exclusive Lease.  It is understood and agreed that the Lessee is not receiving, nor does it receive by this document, an exclusive lease of the Leased Premises, but Lessee's lease and rights of use of the Leased Premises are limited to the mining of Materials on the Leased Premises as provided in Section 1, and exclusively from the Leased Premises herein described.  All uses of the Leased Premises not being mined for Materials as herein required, are hereby reserved to Lessor to graze livestock or for other use which does not interfere with Lessee's use as herein granted.

8.     Scales.  Lessee agrees to install and maintain on the Leased Premises at its own cost and expense, so long as this Lease is in force, a certified motor truck scale, which will be used for the purpose of keeping an accurate account of all Materials mined and removed from the Leased Premises.  The scale will be checked for accuracy at appropriate periodic intervals.

Page 4

9. **Books and Records.** Throughout the term of this Lease, Lessee shall furnish to Lessor, on or before the 20th day of each calendar month following any calendar month in which Materials were removed from the Leased Premises, a complete and accurate statement showing the number of tons and types of Materials mined and removed from the Leased Premises by Lessee during the preceding calendar month. Within 90 days after the end of each Lease Year, Lessee's chief financial officer shall certify to Lessor the number of tons and types of Materials mined and removed from the Leased Premises by Lessee during the preceding Lease Year. Lessor may, at all reasonable times during business hours and at Lessee's premises, audit the books, maps and records of Lessee reasonably necessary to accurately determine, for any period, the tonnages of Materials mined and removed from the Leased Premises. Additionally, Lessor may, from time to time, make or obtain topographical surveys, maps, site photographs and video tapes and/or aerial photographs and video tapes of the Leased Premises to assist in the calculation of tonnages of Materials mined and removed from the Leased Premises (and Lessor may obtain access to the Leased Premises at all times reasonably necessary to make or obtain such surveys, maps, photographs and/or video tapes). If any such audit, survey, map, photograph or video tape discloses information showing that Royalties are owed to Lessor under this Lease which Lessee has failed to pay, Lessee shall immediately pay such Royalties or other payments to Lessor together with interest thereon at the rate provided in Section 3 hereof commencing on the date the Royalties or other payments should have been paid to Lessor under this Lease.

10. **Taxes.** Lessor shall pay prior to delinquency all taxes assessed against the Leased Premises. Within 15 days after delivery by Lessor to Lessee of a tax statement and evidence of payment by Lessor of the taxes set forth therein, Lessee shall reimburse Lessor for Eighty-Seven and Five-Tenths Percent (87.5%) of all taxes paid that are attributable to any increase in the valuation of the Leased Premises subsequent to the execution of this Lease, it being agreed that such reimbursement represents an equitable allocation of tax responsibility between Lessor and Lessee. Lessor may contest any tax assessed against the Leased Premises or any valuation of the Leased Premises by a governmental authority for tax purposes. Lessee waives any right it may have, at law or otherwise, to contest any tax assessed against the Leased Premises or any valuation of the Leased Premises for tax purposes. Lessee shall pay prior to delinquency all taxes assessed upon or levied against all vehicles, equipment, machinery or other property of Lessee installed or placed in, on, and/or under the surface of the Leased Premises.

11. **Applicable Laws.** Lessee shall conduct its operations on the Leased Premises in accordance with all applicable local, state and federal ordinances, laws, orders, rules and regulations. Without limiting the generality of the foregoing, Lessee agrees as follows:

(a) Lessee shall secure all permits required from governmental authorities to conduct operations permitted under this Lease, and shall provide to Lessor copies of such permits.

(b) To the extent Lessee uses explosives in its operations under this Lease, Lessee shall store, transport, secure and use the explosives in accordance with all applicable requirements imposed by the Federal Bureau of Alcohol, Tobacco and Firearms and any other applicable governmental authority. Lessee shall obtain Lessor's prior written approval of Lessee's plan for storage of any explosives on the Leased Premises.

Page 5

13.5

(c)    Lessee shall limit mining to areas of the Leased Premises which comply with any and all boundary setback requirements imposed by applicable law.

(d)    In addition to the requirements of Section 9, Lessee shall perform any reclamation of the Leased Premises required by applicable law with respect to Lessee's operations.

12.    No Warranty.    LESSOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY OR QUANTITY OF THE MATERIALS. LESSEE ACKNOWLEDGES THAT IT HAS BEEN GIVEN FULL ACCESS TO THE LEASED PREMISES AND HAS MADE EXAMINATIONS AND CONDUCTED TESTS THEREON TO SATISFY ITSELF AS TO THE NATURE, QUALITY AND QUANTITY OF THE MATERIALS.

13.    Reclamation of Surface.  Lessee shall level all areas mined by Lessee by filling in pits with waste material from the immediate area and removing all large rock from the surface of the ground and filling of valleys in such a manner that the area can be traversed with farm machinery. All ridges and peaks of land and stock piles of Materials or waste products stored on the Leased Premises shall be graded to a rolling topography traversable by machines necessary for maintenance.  All soil disturbed for plant construction shall be reclaimed to its original condition. Reclamation will commence twelve (12) months after mining begins.

14.    Due Care.  Throughout the Term, Lessee shall conduct its operations in a clean, safe and responsible manner and in a manner that will maximize the mining and shipping of commercially saleable Materials.  At all times upon entering or leaving the Leased Premises, Lessee shall leave all gates closed and locked. Lessee shall exercise due care to avoid damaging any of Lessor's buildings, improvements, equipment or other property located on the Leased Premises. If any damage should occur to any of Lessor's buildings, improvements, equipment or other property as the result of the acts or omissions of Lessee or its agents or employees or any other person for whom Lessee is legally responsible, Lessee shall pay to Lessor on demand the cost of any required repair or replacement.

15.    Indemnity.  Lessee shall defend, indemnify and hold harmless Lessor against all claims, suits, losses, costs, damages and expenses (including reasonable attorneys' fees) asserted against or incurred by Lessor on account of or arising from Lessee's operations under this Lease.

16.    Insurance.  Throughout the Term, Lessee shall maintain the following types of insurance in amounts not less than those set forth below:

(a)    Worker's compensation insurance in an amount sufficient to cover full liability under the worker's compensation laws of the State of Oklahoma, together with employer's liability insurance in an amount not less than $500,000.  The policies evidencing the insurance required under this subsection (a) shall not be endorsed with a waiver of subrogation endorsement, waiving the carrier's right of recovery under subrogation or otherwise from Lessor.

(b)    Commercial general liability insurance, written on an "occurrence" (as opposed to a "claims made") basis, insuring against claims for personal injury, sickness,

Page 6

13.6

disease or death and against claims for injury or destruction of property. Such insurance shall include the following coverages:

       (i)     Explosion, collapse and underground hazards;

       (ii)    Blanket contractual liability, including Lessee's indemnity obligations under this Lease;

       (iii)   Broad form coverage for property damage (extended to apply to completed operations);

       (iv)   Products and completed operations liability;

       (v)    Independent contractor's protective liability to cover Lessee's liability arising out of operations performed by independent contractors retained by Lessee; and

       (vi)   Operations and premises liability (including elevator liability).

Limits of liability in the commercial general liability policy shall not be less than $1,000,000 per occurrence and $2,000,000 annual aggregate for bodily injury, and not less than $500,000 per occurrence and $2,000,000 annual aggregate for property damage.

       (c)    Automatic liability insurance, covering operation of all owned, hired and non-owned vehicles, in an amount of not less than $1,000,000 combined single limit.

       (d)    "Umbrella" excess liability insurance providing insurance coverage for all risks covered by the commercial general liability and automobile liability policies referenced above in excess of the insurance limits afforded under such policies, in an amount of at least $10,000,000.

All policies of insurance required by subsections (b), (c) and (d) above shall name Lessor as an additional insured or forms satisfactory to Lessor, and shall contain endorsed provisions obligating the respective insurance companies to give not less than 30 days written notice to Lessor prior to the effective date of the cancellation or change which would negate or diminish coverage or limits of such policies, regardless of whether such cancellation or change be initiated by the insurance company or on instructions of the insured. Before commencing operations under this Lease and thereafter at least 15 days prior to the scheduled expiration of any insurance policy required hereunder, Lessee shall furnish certificates of insurance satisfactory to Lessor from each insurance company evidencing that all insurance required hereunder is in force.

      17.    Default.  The following events shall constitute events of default by Lessee under this Lease:

       (a)    Lessee shall fail to pay Lessor any Royalties, or any other monetary amount owing under this Lease within the time provided hereunder.

(b)     Lessee shall fail to maintain any insurance required under Section 16 above or to deliver to Lessor certificates of such insurance in the manner and within the time required under Section 16.

(c)     Lessee shall fail to comply with any term, provision or covenant of this Lease, other than the terms, provisions and covenants covered by subsections (a) and (b) above, and shall not cure such failure within twenty (20) days after delivery of written notice thereof to Lessee.

(d)     Lessee shall file a petition for relief under the United States Bankruptcy Code, as amended, or any other present or future federal or state insolvency, bankruptcy or similar law (all of the foregoing hereinafter collectively called "applicable Bankruptcy Law"), or an involuntary petition for relief is filed against Lessee under any applicable Bankruptcy Law and such petition is not dismissed within sixty (60) days after the filing thereof, or an order for relief naming Lessee is entered under any applicable Bankruptcy Law, or any composition, rearrangement, extension, reorganization or other relief of debtors now or hereafter existing is requested or consented to by Lessee.

(e)     The leasehold hereunder shall be taken on execution or other process of law in any action against Lessee.

18.     Remedies.  If any event of default by Lessee shall occur, Lessor shall have the right at its election, then or at any time thereafter while such event of default shall continue, to pursue any one or more of the following remedies:

(a)     Terminate this Lease by giving written notice thereof to Lessee, in which event Lessee shall immediately surrender the Leased Premises to Lessor and if Lessee fails to do so, Lessor may, without prejudice to any other remedy which it may have for possession or arrearages in Royalties or other monetary amounts owing to Lessor hereunder, enter upon and take possession of the Leased Premises and expel or remove Lessee and any other person who may be occupying the Leased Premises.

(b)     To the extent permitted by applicable law, obtain injunctive relief in case of the violation, or attempted or threatened violation, of any of the covenants, agreements, conditions or provisions of this Lease, or to a decree compelling performance of any of the covenants, agreements, conditions or provisions of this Lease.

No right or remedy herein conferred upon or reserved to Lessor is intended to be exclusive of any other right or remedy, and each right and remedy shall be cumulative and in addition to any right or remedy given hereunder or now or hereafter existing at law or in equity.

19.     Security Interest.  In addition to any statutory Lessor's lien available to Lessor and in order to secure payment of all Royalties and other sums of money becoming due hereunder from Lessee, and to secure payment of any damages or loss which Lessor may suffer by reason of the breach by Lessee of any covenant, agreement or condition contained herein, Lessee hereby grants unto Lessor a security interest in all Materials, whether in raw or processed form, and all proceeds thereof.  Upon the occurrence of an event of default by Lessee, Lessor may, in addition to any other remedies provided herein, enter upon the Leased Premises and take

Page 8

possession of any and all Materials, without liability for trespass or conversion (and Lessee hereby waives any right to notice or hearing prior to such taking of possession by Lessor), and sell the same at public or private sale, with or without having such property at the sale after giving Lessee reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made, at which the Lessor or its assigns may purchase unless otherwise prohibited by law. Unless otherwise provided by law, and without intending to exclude any other manner of giving Lessee reasonable notice, the requirement of reasonable notice shall be met if such notice is giving in the manner prescribed under the notice provisions of this Lease at least five days before the day of sale. The proceeds form any such disposition, less any and all expense connected with the taking of possession, holding and selling of the property (including reasonable attorneys' fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interested granted in this section. Any surplus shall be paid to Lessee or as otherwise required by law; and Lessee shall pay any deficiency forthwith. Contemporaneously with the execution of this Lease, Lessee shall execute and deliver to Lessor a financing statement in form sufficient to perfect the security interest of Lessor in the Materials and proceeds thereof under the provisions of the Oklahoma Business and Commerce Code. Lessor may at any time file a copy of this Lease as a financing statement.

20.  **Notices.**  Any notice, request, demand or other communication required or permitted hereunder shall be given in writing by (a) personal delivery; or (b) expedited delivery serve with proof of delivery, or (c) United States mail, postage prepaid, registered or certified mail, return receipt requested, or (d) prepaid telegram, telex or telecopy, sent to the intended addressee at the address shown on the signature page of this Lease, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith.  Any such notice, request, demand or other communication shall be deemed to have been given either at the time of personal delivery or, in the case of delivery services or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of telegram, telex or telecopy, upon receipt.

21.  **Attorney's Fees.**  Should either party hereto institute any legal proceeding to enforce any provision hereof or for damage by reason of any alleged breach of any provision of this Lease or for any other judicial remedy, the prevailing party shall be entitled to receive from the losing party all reasonable attorney's fees and all court costs in connection with such proceeding.

22.  **Assignment.**  Without the prior written consent of Lessor, Lessee shall not assign all or any part of its rights or interests hereunder.  Lessor shall not withhold such consent if the proposed assignee possesses adequate experience, credit worthiness, meaning that said party would quality for a comparable loan at any state or federal institution regulated by applicable banking laws and the ability to perform Lessee's duties and obligations under this Lease.  Lessor may assign all or any part of its rights or interest hereunder without the consent of Lessee. Subject to the preceding sentence, the provisions hereof shall extend to and be binding upon the successors and assigns of the parties hereof; and no change or division in ownership of the Property, the Materials or the Royalties or other amounts payable hereunder, however accomplished, shall operate to diminish the obligations of Lessee hereunder.

13.9

23.    Quiet Enjoyment.  Lessor represents that Lessor is the sole owner of the Lease
Premises, however, if there is no encumbrances outstanding against the Leased Premises, Lessor
represents that it has the full right to lease the same upon the terms set forth herein.  Lessor
further covenants that Lessee shall peacefully and quietly enjoy the Leased Premises for the term
of this Lease or any extension or renewal thereof.  In case Lessor owns an interest in the
Materials in and under the Leased Premises less than an undivided fee simple estate therein, then
the payments to Lessor herein provided for shall be paid to Lessor only in proportion which
Lessor's interest bears to the whole and undivided fee therein.

24.    Authority of Lessor.  It is expressly agreed that no change or division of the
ownership of the Leased Premises or any part of the same, however arising or effected, shall
operate to increase the obligations or diminish the rights of Lessee hereunder.  Notwithstanding
any other actual or constructive knowledge or notice whatsoever thereof, Lessee shall not be
bound by such change or division until it has received a copy of the assignment or other evidence
of transfer.  In the event of an assignment or transfer of a divided interest in the Leased Premises,
the rentals payable hereunder shall be apportionable as between the several owners according to
the surface area or undivided interest of each, and default in rental payment by one shall not
affect the rights of the other owners of the Leased Premises.

25.    Force Majeure.  Should Lessee be prevented by any cause reasonably beyond
Lessee's control, including, without limitation, flood, windstorm, any federal or state law or any
other order, rule or regulation or governmental authority of which Lessee was unaware through
the normal exercise of business diligence, litigation, act of God, and act of public enemy, from
complying with any express or implied covenant of this Lease, then, while so prevented and for a
reasonable period of time thereafter (not to exceed thirty (30) days), Lessee's obligation to
comply with such covenant shall be suspended; and Lessee shall notify Lessor of the beginning
and ending date of each such period of force majeure.

26.    Lessor Default.  Lessor agrees that Lessee shall have the right in the event of a
default by Lessor of obligations to make payments on any encumbrance or obligation to pay
taxes that directly threaten the possession of Lessee and provided that Lessee is current in all of
Lessee's obligations.  Lessee may make such payments and be allowed an offset against sums
due Lessor.  However, the right of Lessee to make such payments is specifically conditioned on
Lessee's compliance and performance with all terms and conditions of the Lease and the actual
threat of the taking of the premises or interference with Lessee's possession by such defaults by
Lessor.

27.    Memorandum.  The parties agree that this Lease shall not be filed of record, but
that instead, the parties shall sign and file a Memorandum of Lease in the form attached hereto as
Exhibit B.

28.    Validity.  A determination that any provision of this Lease is unenforceable or
invalid shall not affect the enforceability or validity of any other provision, and the determination
that the application of any provision of this Lease to any person or circumstance is illegal or
unenforceable shall not affect the enforceability or validity of such provision as it may apply to
other persons or circumstances.

Page 10

13.10

29.   <u>Waiver</u>.   No waiver of any provision of this Lease and no consent to any departure herefrom shall be effective unless or until the same shall be in writing and signed by the party against whom such waiver or consent shall be claimed, and then such waiver or consent shall be effective only as to the specific instance and for the specific purpose for which it is given.

30.   <u>Complete Agreement</u>.   This Lease expresses the complete agreement between Lessor and Lessee.  No other oral or written agreements exist between Lessor and Lessee which are not expressed herein.  The agreements expressed herein cannot be amended or waived except by an instrument in writing signed by both Lessor and Lessee.

31.   <u>Counterparts</u>.   This Lease may be executed in any one or more counterparts, each of which shall constitute an original, but all of which together shall constitute but one and the same Lease.

[Signatures Follow]

13.11

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease as of the date first written above.

LEO AND MABEL SCOTT CHARITABLE TRUST

By:   THE FROST NATIONAL BANK,
      Co-Trustee

By: _____
Name: _____
Title: _____
        John W. Schmedemann
        Vice President

Address: _____
        FROST NATIONAL BANK
        TRUST REAL ESTATE (T-5)
        P. O. BOX 2950
        SAN ANTONIO, TX 78299-2950

By:   OKLAHOMA CHRISTIAN UNIVERSITY,
      Co-Trustee

By: _____
Name: _____ Stephen C. Eck
Title: _____ Vice President

Address: 2501 E. Memorial Rd
        Oklahoma City, OK 73013

Page 12

13.12

By    NORTH CENTRAL TEXAS COLLEGE,
      Co-Trustee

By: _____
Name: _____
Title: _____

Address: _____
_____

By    UNITED WAY OF COOKE COUNTY,
      Co-Trustee

By: _____
Name: _____Tim Tortsville_____
Title: _____Trustee_____

Address: P.O. Box 202
_____Gainesville TX 76241_____

CHARLES N. DAVIS III
2904 Pennsylvania
Denton, Texas 76205

STATE OF _Oklahoma_        )
                           )
COUNTY OF _Oklahoma_       )

BEFORE ME, the undersigned authority, on this day personally appeared _Stephen Beck_, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _6th_ day of _June_, 2011.

DANA HOLLEY
Notary Public
State of Oklahoma
Commission # 10091896  Expires 03/01/14

NOTARY PUBLIC IN AND FOR THE
STATE OF _Oklahoma_
My Commission Expires: _03/01/14_

STATE OF _TEXAS_          )
                          )
COUNTY OF _COOKE_         )

BEFORE ME, the undersigned authority, on this day personally appeared _Tina Turbeville_, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _16th_ day of _June_, 2011.

KEELA STOBAUGH
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-16-2014

NOTARY PUBLIC IN AND FOR THE
STATE OF _TEXAS_
My Commission Expires: _3-16-2014_

13.14

STATE OF ___TEXAS___ )
)
COUNTY OF ___COOKE___ )

BEFORE ME, the undersigned authority, on this day personally appeared ___Debbie Sharp___, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _16th_ day of ___June___, 2011.

___Keela Stobaugh___
NOTARY PUBLIC IN AND FOR THE
STATE OF ___TEXAS___
My Commission Expires: _3-16-2014_

*(Notary seal: KEELA STOBAUGH, Notary Public, STATE OF TEXAS, My Comm. Exp. 03-16-2014)*

STATE OF ___Texas___ )
)
COUNTY OF ___Bexar___ )

BEFORE ME, the undersigned authority, on this day personally appeared ___John Schraderman, V.P.___, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _13th_ day of ___July___, 2011.

___Christie Gonzalez___
NOTARY PUBLIC IN AND FOR THE
STATE OF ___Texas___
My Commission Expires: _3-22-2014_

*(Notary seal: CHRISTIE GONZALEZ, Notary Public, STATE OF TEXAS, My Comm. Exp. 03-22-2014)*

13.15

STATE OF _TEXAS_ )
)
COUNTY OF _COOKe_ )

BEFORE ME, the undersigned authority, on this day personally appeared Charles N. Davis, III, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _2nd_ day of _June_ , 2011.

NOTARY PUBLIC IN AND FOR THE
STATE OF _TEXAS_
My Commission Expires: _3-16-2014_

13.16

## EXHIBIT A

### DESCRIPTION OF THE LEASED PREMISES

THE FOLLOWING PARCELS LOCATED IN LOVE COUNTY, OKLAHOMA, TOWNSHIP 9, SOUTH RANGE 1 EAST:

| Tract | Acres |
|---|---|
| Section 22 Lots 4 & 5 | 27.45 |
| Section 23 SW/4 | 160.00 |
| Section 23 SE/4 | 160.00 |
| Section 24-S/2 NW/4 and NW/4 SW/4 | 11.63 |
| Section 25 S/2 NW/4 and SW/4 | 52.50 |
| Section 25 W/2 NW/4 NW/4 | 4.6901 |
| Section 26 NE/4 and W/2 SE/4 NW/4 | 180.00 |
| Section 26 Lots 3, 4, 5 and N/ SE/4 and SE/4 SE/4 | 196.70 |
| Section 26 Lot 1 and E 15.55 acres of Lot 2 and NE/4 NW/4 and E/2 SE/4 NW/4 | 110.20 |
| Section 26 W 5.25 acres of Lot 2 | 5.25 |
| Section 35 Lot 2 | 8.60 |
| Section 35 Lots 1 and 3 | 48.60 |
| Section 36 NW/4 NW/4 NW/4 | 10.00 |
| Section 36 SE/4 NW/4 NW/4 and E/2 SW/4 NW/4 and all SE/4 NW/4 and Lot 3 W of Hwy 77 | 47.50 |
| Total | 1023.1201 |

13.17

Return
Charles Davis
2904 Pennsylvania Dr
Denton, TX 76205



2012-000284 Book 0714 Pg: 464
06/06/2012  2:20 pm  Pg 0484-0470
$ 25.00    Doc:    $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

**EXHIBIT**

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (the "Memorandum") is dated the 3ʳᵈ day of June , 2011 by and among OKLAHOMA CHRISTIAN UNIVERSITY, NORTH CENTRAL TEXAS COLLEGE, UNITED WAY OF COOKE COUNTY and THE FROST NATIONAL BANK, as Co-Trustees of the Leo and Mabel Scott Charitable Trust ("Lessor") and Charles N. Davis, III ("Tenant").

## RECITALS:

A.     Lessor and Tenant have entered into that certain Mining Lease dated the date hereof calling for a lease of the Property described on Exhibit "A" attached hereto and made a part hereof by this reference for all purposes, (the "Lease");

B.     Lessor and Tenant desire to reflect of record the existence of the Lease and the Option and therefore have entered into this Memorandum.

NOW, THEREFORE, for and in consideration of Ten Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereby state and agree as follows:

1.     The parties desire to record this Memorandum to reflect the existence of the Lease and the rights of the Lessor and the Tenant in accordance therewith.

2.     Lessor and Tenant hereby specifically agree that in the event that the Tenant shall default or fail to perform any of its obligations under and pursuant to the Lease, or should the Lease terminate for any reason, the Lessor shall be entitled to execute a release and termination of this Memorandum. The Tenant hereby grants and appoints to the Lessor, a power of attorney, such power of attorney being coupled with an interest and to constitute a durable power of attorney whereby the power of attorney shall survive the death, termination or liquidation of all or any of the persons or entities comprising the Tenant and shall continue notwithstanding the bankruptcy of any of the persons or entities comprising the Tenant. This power of attorney shall be granted for the purpose of executing on behalf of the Tenant, and all persons or entities comprising the Tenant, the release and termination of this Memorandum in the event that the Tenant shall default under or fail to perform any of its obligations under the Lease, shall fail to exercise the Option or, in the event that the Lease or the Option shall terminate for any reason.

3.     Defined terms used herein shall bear the same meaning as set forth in the Lease and the exhibits attached thereto except as otherwise provided herein.

[Signature Page Follows]

13.18

I-2012-0005964  Book 0714  Pg 465
01/20/2012   2:20 pm  Pg 0464-0470
Fee:   $ 28.00    Doc:   $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum effective as of the date set forth above.

LESSOR:

LEO AND MABEL SCOTT CHARITABLE TRUST

By:     THE FROST NATIONAL BANK,
        Co-Trustee

By: _____

Name: _____

Title: _____
        John W. Schmedemann
        Vice President

By:     OKLAHOMA CHRISTIAN UNIVERSITY,
        Co-Trustee

By: _____

Name: _____

Title: _____

By      NORTH CENTRAL TEXAS COLLEGE,
        Co-Trustee

By: _____

Name: _____

Title: _____

By      UNITED WAY OF COOKE COUNTY,
        Co-Trustee

By: _____

Name: _____

Title: _____

13.19

I-2012-000284  Book 0714  Pg: 466
01/20/2012   2:20 pm   Pg 0464-0470
Fee:   $ 25.00      Doc:   $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

LESSEE:

CHARLES N. DAVIS, III

13.20

STATE OF Oklahoma  )

COUNTY OF Oklahoma  )

I-2012-000284 Book 0714 Pg:467
01/20/2012  2:20 pm  Pg:0464-0470-
Fee:   $ 26.00   Doc:   $ 0.00
Shelly Russel - Love County Clerk
State of Oklahoma

BEFORE ME the undersigned authority, on this day personally appeared
Stephen Berl_____, known to me to be the person whose name is subscribed
to the foregoing instrument and acknowledged to me that such person executed the same in the
capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 6th day of
June_____, 2011.

DANA HOLLEY
Notary Public
State of Oklahoma
Commission # 10001580  Expires 03/01/14

NOTARY PUBLIC IN AND FOR THE
STATE OF Oklahoma
My Commission Expires:  03/01/14

STATE OF TEXAS  )

COUNTY OF CLOKE  )

BEFORE ME, the undersigned authority, on this day personally appeared
Jim Turbeville_____, known to me to be the person whose name is subscribed
to the foregoing instrument and acknowledged to me that such person executed the same in the
capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 16th day of
June_____, 2011.

KEELA STORAUGH
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-16-2014

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS
My Commission Expires:  3-16-2014

13.21

STATE OF _TEXAS_          )

COUNTY OF _COOKE_         )

J2012-000288 Book 0714 Pg: 488
01/20/2012  2:29 pm  Pg 0464-0470
Fee: $28.00    Doc: $.0.00
Shelly Russell - Love County Clerk
State of Oklahoma

BEFORE ME, the undersigned authority, on this day personally appeared _Debbie Sharp_, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _16th_ day of _June_, 2011.

KEELA STORAUGH
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-16-2014

NOTARY PUBLIC IN AND FOR THE
STATE OF _TEXAS_
My Commission Expires: _3-16-2014_

STATE OF _Texas_          )

COUNTY OF _Bexar_         )

BEFORE ME, the undersigned authority, on this day personally appeared _John Schneiderwent, Jr.?_, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _13th_ day of _Friday_, 2011.

CHRISTIE GONZALEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-22-2014

NOTARY PUBLIC IN AND FOR THE
STATE OF _Texas_
My Commission Expires: _3-22-2014_

13.22

STATE OF _TEXAS_ )
)
COUNTY OF _COOKE_ )

I-2012-000284 Book 0714 Pg: 469
01/20/2012  2:20 pm  Pg 0484-0470
Fee:   $ 25.00    Doc:   $ 0.00
Shelly Russell – Love County Clerk
State of Oklahoma

BEFORE ME, the undersigned authority, on this day personally appeared Charles N. Davis, III, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 2nd day of _June_ ,2011.

NOTARY PUBLIC IN AND FOR THE
STATE OF _TEXAS_
My Commission Expires: _3-11-2014_

KEELA STOBAUGH
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-11-2014

13.23



## EXHIBIT "A"

### PROPERTY DESCRIPTION

THE FOLLOWING PARCELS LOCATED IN LOVE COUNTY, OKLAHOMA, TOWNSHIP 9, SOUTH RANGE 1 EAST:

| Tract | Acres |
|---|---|
| Section 22 Lots 4 & 5 | 27.45 |
| Section 23 SW/4 | 160.00 |
| Section 23 SE/4 | 160.00 |
| Section 24-S/2 NW/4 and NW/4 SW/4 | 11.63 |
| Section 25 S/2 NW/4 and SW/4 | 52.50 |
| Section 25 W/2 NW/4 NW/4 | 4.6901 |
| Section 26 NE/4 and W/2 SE/4 NW/4 | 180.00 |
| Section 26 Lots 3, 4, 5 and N/ SE/4 and SE/4 SE/4 | 196.70 |
| Section 26 Lot 1 and E 15.55 acres of Lot 2 and NE/4 NW/4 and E/2 SE/4 NW/4 | 110.20 |
| Section 26 W 5.25 acres of Lot 2 | 5.25 |
| Section 35 Lot 2 | 8.60 |
| Section 35 Lots 1 and 3 | 48.60 |
| Section 36 NW/4 NW/4 NW/4 | 10.00 |
| Section 36 SE/4 NW/4 NW/4 and E/2 SW/4 NW/4 and all SE/4 NW/4 and Lot 3 W of Hwy 77 | 47.50 |
| Total | 1023.1201 |

13.24

# EXHIBIT

# "D"

I-2013-005889  Book 0753  Pg: 208
10/28/2013 11:00 am  Pg 0208-0216
Fee:  $ 33.00     Doc:     $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

## MEMORANDUM OF LEASE ASSIGNMENT AND AMENDMENT

THIS MEMORANDUM OF LEASE ASSIGNMENT AND AMENDMENT OF MINING LEASE (the "Memorandum") is made and entered into effective as of September 30 2013 (the "Effective Date") by and among Red River Aggregates, LLC, a Texas limited liability company registered and authorized to do business in the State of Oklahoma ("Assignor"), Redi-Mix, LLC, a Texas limited liability company ("Assignee"), and by Oklahoma Christian University, North Central Texas College, United Way of Cooke County and Frost Bank, formerly The Frost National Bank, as Co-Trustees of the Leo and Mabel Scott Charitable Trust ("Lessor").

### RECITALS

WHEREAS, Lessor and Assignor entered into that certain Mining Lease dated June 3, 2011, a memorandum of which was recorded at 2:20 PM on January 20, 2012 in the office of the Clerk for Love County, State of Oklahoma at I-2012-000284 Book 0714 Pg: 464-0470 calling for a lease of the Property described on Exhibit 1 attached hereto and made a part hereof by this reference for all purposes, (the "Lease"); and

WHEREAS, Lessor, Assignor and Assignee have entered into that certain Assignment, Consent to Assignment and Amendment of Lease dated the date hereof and made a part hereof by this reference for all purposes (the "Assignment"); and,

WHEREAS, Lessor, Assignor and Assignee desire to reflect of record the existence of the Assignment and the rights of the Lessor, Assignor and Assignee in accordance therewith;

NOW, THEREFORE, for and in consideration of Ten Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereby state and agree as follows:

1. The parties desire to record this Memorandum to reflect that the Assignor has with Lessor's consent assigned its interest as lessee under the Lease to Assignee and that the lease has been amended in various respects as provided for in the Assignment.

2. The parties hereby specifically agree that in the event that the Assignee shall default or fail to perform any of its obligations under and pursuant to the Lease, or should the Lease terminate for any reason, the Lessor shall be entitled to execute a release and termination of this Memorandum. Assignee hereby grants and appoints to the Lessor, a power of attorney, such power of attorney being coupled with an interest and to constitute a durable power of attorney whereby the power of attorney shall survive the death, termination or liquidation of all or any of the persons or entities comprising the Assignee. This power of attorney shall be granted for the purpose of executing on behalf of the Assignee, and all persons or entities comprising the Assignee, the release and termination of this

Page 1



Memorandum if the Assignee shall default under or fail to perform any of its obligations under the Lease, or if the Lease shall terminate for any reason.

3.      Defined terms used herein shall bear the same meaning as set forth in the Lease and the exhibits attached thereto except as otherwise provided herein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

LESSOR, LEO AND MABEL SCOTT
CHARITABLE TRUST

By: Frost Bank, Co-Trustee

By
Name:
Title:      John W. Schmedamann
            Vice President

By: Oklahoma Christian University, Co-Trustee

By
Name:
Title:

By: North Central Texas College, Co-Trustee

By
Name:
Title:

By: United Way of Cooke County, Co-Trustee

By
Name:
Title:

I-2013-005889  Book 0753  Pg: 209
10/29/2013 11:00 am  Pg 0206-0216
Fee'    $ 33.00    Doc:    $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

Page 2

Memorandum if the Assignee shall default under or fail to perform any of its obligations under the Lease, or if the Lease shall terminate for any reason.

3.    Defined terms used herein shall bear the same meaning as set forth in the Lease and the exhibits attached thereto except as otherwise provided herein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

LESSOR, LEO AND MABEL SCOTT
CHARITABLE TRUST

By: Frost Bank, Co-Trustee

By_____
Name:_____
Title:_____

By: Oklahoma Christian University, Co-Trustee

By_____
Name: Stephen Eck
Title: Vice President General Counsel

By: North Central Texas College, Co-Trustee

By_____
Name:_____
Title:_____

By: United Way of Cooke County, Co-Trustee

By_____
Name:_____
Title:_____

I-2013-005869  Book  0753  Pg: 210
10/29/2013  11:00 am   Pg 0208-0218
Fee:    $ 33.00    Doc:    $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

Page 2

Memorandum if the Assignee shall default under or fail to perform any of its obligations under the Lease, or if the Lease shall terminate for any reason.

3. Defined terms used herein shall bear the same meaning as set forth in the Lease and the exhibits attached thereto except as otherwise provided herein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

LESSOR, LEO AND MABEL SCOTT
CHARITABLE TRUST

By: Frost Bank, Co-Trustee

By_____
Name:_____
Title:_____

By: Oklahoma Christian University, Co-Trustee

By_____
Name:_____
Title:_____

By: North Central Texas College, Co-Trustee

By Debbie Sharp
Name: Debbie Sharp
Title: Executive Director

By: United Way of Cooke County, Co-Trustee

By_____
Name:_____
Title:_____

I-2013-005889 Book 0753 Pg: 211
10/29/2013 11:00 am  Pg 0206-0218
Fee:   $ 33.00     Doc:   $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

Page 2

Memorandum If the Assignee shall default under or fail to perform any of its obligations under the Lease, or if the Lease shall terminate for any reason.

3,   Defined terms used herein shall bear the same meaning as set forth in the Lease and the exhibits attached thereto except as otherwise provided herein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

LESSOR, LEO AND MABEL SCOTT
CHARITABLE TRUST

By: Frost Bank, Co-Trustee

By_____
Name:_____
Title:_____

By: Oklahoma Christian University, Co-Trustee

By_____
Name:_____
Title:_____

By: North Central Texas College, Co-Trustee

By_____
Name:_____
Title:_____

By: United Way of Cooke County, Co- Trustee

By_____
Name:_____
Title:_____

I-2013-005889  Book  0753  Pg: 212
10/29/2013 11:00 am   Pg 0208-0218
Fee:    $ 33.00     Doc:    $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

Page 2

ASSIGNOR:

Red River Aggregates, LLC

By: Charles N. Davis, III
Its Chairman

ASSIGNEE

Redi-Mix, LLC

By _____

Niel L. Poulsen
Vice President

STATE OF TEXAS                   §

COUNTY OF DENTON                 §

On this 26 day of SEPT _____, 2013, personally appeared before me Charles N. Davis, III, as Chairman of Red River Aggregates, LLC a, Texas limited liability company, and that said instrument was signed by said person in such capacity.

SEAL

> CRYSTAL R. KING
> Notary Public, State of Texas
> My Commission Expires
> September 20, 2014

(Signature) _____

My commission expires: SepT 20, 2014

I-2013-005889  Book  0763  Pg: 213
10/29/2013 11:00 am  Pg 0208-0218
Fee:    $ 33.00     Doc:    $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

STATE OF TEXAS                   §

COUNTY OF Tarrant                §

On this 26 day of Sept _____, 2013, personally appeared before me Niel L. Poulsen, who being by me duly affirmed, did say that he is the Vice President of Redi-Mix, LLC, a Texas limited liability company, and that said instrument was signed by said person on behalf of said corporation.

SEAL

> SANDRA ALLEN
> Notary Public, State of Texas
> My Commission Expires
> March 08, 2017

(Signature) _____

My commission expires: March 08, 2017

Page 3

STATE OF Texas

COUNTY OF Bexar

BEFORE ME, the undersigned authority, on this day personally appeared John Schmidmann, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 11th day of September, 2013.

> CHRISTIE GONZALEZ
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. 03-22-2014

NOTARY PUBLIC IN AND FOR THE STATE
OF Texas
My commission expires: 3-22-2014

STATE OF _____

COUNTY OF _____

BEFORE ME, the undersigned authority, on this day personally appeared _____ known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this ___ day of ___, 2013.

NOTARY PUBLIC IN AND FOR THE STATE
OF _____
My commission expires: _____

I-2013-005869  Book  0753  Pg: 214
10/29/2013  11:00 am  Pg 0208-0218
Fee:  $ 33.00    Doc:   $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

Page 4

STATE OF _____

COUNTY OF _____

    BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this ___ day of ____, 2013.

                          NOTARY PUBLIC IN AND FOR THE STATE
                          OF _____
                          My commission expires: _____

STATE OF Oklahoma

COUNTY OF Oklahoma

    BEFORE ME, the undersigned authority, on this day personally appeared Stephen Eck, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this 27 day of Sept, 2013.

                        *Marcy Leonard*
                        NOTARY PUBLIC IN AND FOR THE STATE
                        OF Oklahoma
                        My commission expires: 10·11·16

MARCY LEONARD
NOTARY
# 12009648
EXP. 10/11/16
PUBLIC
STATE OF OKLAHOMA

                      I-2013-005889  Book 0763  Pg: 215
                      10/29/2013  11:00 am   Pg 0208-0216
                      Fee:   $ 33.00   Doc:    $ 0.00
                      Shelly Russell - Love County Clerk
                          State of Oklahoma

Page 4

STATE OF _Texas_

COUNTY OF _Cooke_

BEFORE ME, the undersigned authority, on this day personally appeared _Debbie Sharp_, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _2_ day of _Sept_, 2013.

LYNN C. PETERS
Notary Public, State of Texas
My Commission Expires
February 24, 2016

_Lynn C. Peters_
NOTARY PUBLIC IN AND FOR THE STATE OF _____
My commission expires:_____

STATE OF _____

COUNTY OF _____

BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this ___ day of ____, 2013.

NOTARY PUBLIC IN AND FOR THE STATE OF _____
My commission expires:_____

I-2013-005889 Book 0763 Pg: 216
10/29/2013 11:00 am Pg 0208-0216
Fee:   $ 33.00   Doc:   $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

Page 5

STATE OF _____

COUNTY OF _____

BEFORE ME, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed,

GIVEN UNDER MY HAND AND SEAL OF OFFICE this ___ day of ____, 2013.

_____
NOTARY PUBLIC IN AND FOR THE STATE
OF _____
My commission expires: _____

STATE OF Texas

COUNTY OF Cooke

BEFORE ME, the undersigned authority, on this day personally appeared Tim Turbeville, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that such person executed the same in the capacity and for the purposes and consideration therein expressed,

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 27 day of Sept 2013.

_____
Tina Morgan
NOTARY PUBLIC IN AND FOR THE STATE
OF Texas
My commission expires: 1/16/14

TINA MORGAN
Notary Public, State of Texas
My Commission Expires 1-16-2014

I-2013-005889  Book 0753  Pg: 217
10/29/2013 11:00 am  Pg 0208-0218
Fee:   $ 33.00   Doc:   $ 0.00
Shelly Russel - Love County Clerk
State of Oklahoma

Page 4

## EXHIBIT 1

### DESCRIPTION OF THE LEASED PREMISES

Situated in the County of Love, State of Oklahoma, Township 9 South, Range 1 East, of the Indian Base and Meridian, being more particularly described as follows:

| | |
|---|---|
| Section 22 Lot 4 | 20.05 AC |
| Section 22 Lot 5 | 10.87 AC |
| Section 22 Accreted Land | 85.32 AC |
| Section 23 SW/4 | 160.61 AC |
| Section 23 SE/4 | 159.90 AC |
| Section 24 S/2 NW/4 West of BNSF Railroad | 34.16 AC |
| Section 24 NW/4 SW/4 West of BNSF Railroad | 10.78 AC |
| Section 25 W/2 NW/4 NW/4 West of BNSF Railroad | 4.81 AC |
| Section 25 S/2 NW/4 West of BNSF Railroad | 12.99 AC |
| Section 25 SW/4 West of BNSF Railroad | 49.29 AC |
| Section 26 NE/4 | 160.22 AC |
| Section 26 SE/4 NW/4 | 28.51 AC |
| Section 26 N/2 SE/4 | 80.27 AC |
| Section 26 SE/4 SE/4 | 40.02 AC |
| Section 26 NE/4 NW/4 | 40.56 AC |
| Section 26 Lot 1 | 20.85 AC |
| Section 26 Lot 2 | 0.15 AC |
| Section 26 Lot 3 | 7.14 AC |
| Section 26 Lot 4 | 0.20 AC |
| Section 26 Lot 5 | 36.71 AC |
| Section 27 Accreted Land | |
| Section 35 Lot 1 | 39.44 AC |
| Section 35 Lot 2 | 12.28 AC |
| Section 35 Lot 3 West of U.S. Highway No. 77 | 13.52 AC |
| Section 35 Accreted Land | 21.74 AC |
| Section 36 NW/4 NW/4 NW/4 | 10.01 AC |
| Section 36 SE/4 NW/4 NW/4 | 7.46 AC |
| Section 36 E/2 SW/4 NW/4 | 17.12 AC |
| Section 36 SE/4 NW/4 West of U.S. Highway No. 77 | 5.40 AC |

|  | |
|---|---|
| Sub Total | 1090.38 AC |
| Land within limits of Red River | 160.02 AC |
| **Total** | **1250.40 AC** |

I-2013-005889 Book 0753 Pg: 218
10/29/2013 11:00 am Pg 0208-0218
Fee: $ 33.00   Doc:   $ 0.00
Shelly Russell - Love County Clerk
State of Oklahoma

# EXHIBIT

# "E"

states, or between citizens and the federal government; and 6) institutes a standing commission to resolve any future disputes between Oklahoma and Texas. The compact went into effect August 31, 2000, when both the United States Senate and the House of Representatives approved the Red River Boundary Compact as Joint Resolution 72.

**From:** Steve Schmitz [mailto:sschmitz@B29investments.com]
**Sent:** Monday, June 25, 2018 2:38 PM
**To:** David Behring <dbehring@us-concrete.com>
**Subject:** Stark Ranch, Cooke County, TX

David,

Thank you for taking the time to visit with us in Gainesville last week. At our meeting, you mentioned wanting additional information regarding the methodology used in determining our property boundary line along the Red River.

To follow up on your request for additional information, we engaged a Licensed State Land Surveyor and Registered Professional Land Surveyor by the name of Nedra Foster to determine Stark Ranch – West, LLC's legal boundary along the Red River. There are only a few surveyors in the state of Texas who have the qualifications to determine gradient boundary lines, and Nedra was highly recommended to us as one of the most knowledgeable gradient boundary surveyors in the state, with particular experience along the Red River.

Nedra is an expert in determining boundary lines along Texas river banks and has extensive experience in determining gradient boundaries. Nedra has been a Licensed State Land Surveyor since 2000 and a Registered Professional Land Surveyor since 1999. The LSLS designation is a special certification reserved for surveyors who perform work under which the state of Texas or federal government may have an interest (such as along river banks). I've attached a copy of her resume which summarizes her past experience.

The gradient boundary concept and methodology that Nedra relied upon was developed in a U.S. Supreme Court case involving the boundary between Oklahoma and Texas along the south bank of the Red River (State of Oklahoma v. State of Texas, 260 U.S. 606 (1923)). Under the direction and instruction of the U. S. Supreme Court, surveyors Arthur Stiles (representing the interest of Texas) and Arthur Kidder (representing the interest of the United States and Oklahoma) developed the procedures under which inland watercourse boundaries are determined in Texas.

Based on the guidance developed through such case, Nedra used the following methodology to determine the gradient boundary:

1) Locate a "qualified bank" within a reasonable vicinity of the project. This is an accretion bank that the river has built during times of high water.
2) This bank is measured from the top (where the flowing water just reaches - overtops - and flows back into the river) down to the toe (where the bank and bed of the river meet). Midway between this top and toe is the gradient boundary.
3) If the water is flowing stably, it can be used as a 'plane' from which to work. At the "qualified bank," the relationship between the surface of the stably flowing water and the gradient boundary



will be noted.  For example - on a given day the water may be 1.2 feet below the gradient boundary. Points will be taken through the project area at 1.2 feet above the stably flowing water.  These points will be on the gradient boundary.  By using the water surface, the natural grade of the river is followed.

We are confident in the accuracy of Nedra's work and continue to take the position that Redi-Mix's operations have trespassed on our ranch and converted sand from our property.

We look forward to hearing from you so that we can work toward a prompt business resolution that will make us whole for the damages Stark Ranch – West, LLC has suffered from Redi-Mix's trespass and conversion of sand from our property.

Regards,
David,

Thank you for taking the time to visit with us in Gainesville last week. At our meeting, you mentioned wanting additional information regarding the methodology used in determining our property boundary line along the Red River.

To follow up on your request for additional information, we engaged a Licensed State Land Surveyor and Registered Professional Land Surveyor by the name of Nedra Foster to determine Stark Ranch – West, LLC's legal boundary along the Red River. There are only a few surveyors in the state of Texas who have the qualifications to determine gradient boundary lines, and Nedra was highly recommended to us as one of the most knowledgeable gradient boundary surveyors in the state, with particular experience along the Red River.

Nedra is an expert in determining boundary lines along Texas river banks and has extensive experience in determining gradient boundaries. Nedra has been a Licensed State Land Surveyor since 2000 and a Registered Professional Land Surveyor since 1999. The LSLS designation is a special certification reserved for surveyors who perform work under which the state of Texas or federal government may have an interest (such as along river banks). I've attached a copy of her resume which summarizes her past experience.

The gradient boundary concept and methodology that Nedra relied upon was developed in a U.S. Supreme Court case involving the boundary between Oklahoma and Texas along the south bank of the Red River (State of Oklahoma v. State of Texas, 260 U.S. 606 (1923)). Under the direction and instruction of the U. S. Supreme Court, surveyors Arthur Stiles (representing the interest of Texas) and Arthur Kidder (representing the interest of the United States and Oklahoma) developed the procedures under which inland watercourse boundaries are determined in Texas.

Based on the guidance developed through such case, Nedra used the following methodology to determine the gradient boundary:

1) Locate a "qualified bank" within a reasonable vicinity of the project.  This is an accretion bank that the river has built during times of high water.
2) This bank is measured from the top (where the flowing water just reaches - overtops - and flows back into the river) down to the toe (where the bank and bed of the river meet).  Midway between this top and toe is the gradient boundary.
3) If the water is flowing stably, it can be used as a 'plane' from which to work. At the "qualified bank," the relationship between the surface of the stably flowing water and the gradient boundary

will be noted. For example - on a given day the water may be 1.2 feet below the gradient boundary. Points will be taken through the project area at 1.2 feet above the stably flowing water. These points will be on the gradient boundary. By using the water surface, the natural grade of the river is followed.

We are confident in the accuracy of Nedra's work and continue to take the position that Redi-Mix's operations have trespassed on our ranch and converted sand from our property.

We look forward to hearing from you so that we can work toward a prompt business resolution that will make us whole for the damages Stark Ranch – West, LLC has suffered from Redi-Mix's trespass and conversion of sand from our property.

Regards,

Steve Schmitz

**From:** David Behring <dbehring@us-concrete.com>
**Sent:** Wednesday, June 20, 2018 9:03 AM
**To:** Steve Schmitz <sschmitz@B29Investments.com>
**Subject:** Re: Message and Letter from last week

Sounds great. See you then.

Sent from my iPhone

On Jun 20, 2018, at 9:01 AM, Steve Schmitz <sschmitz@B29Investments.com> wrote:

> Yes, that works great. Please come to my office on the square in downtown Gainesville – 201 W. California St. It is the NW corner of the square.
>
> I would like for you and I and Myranda Shugart to meet (she is the land manager in our office and understands all the maps)
>
> We have a helicopter and I could line up a quick tour from the air as well after we meet if you would like. It may help you better understand the situation.
>
> Best,
>
> Steve
>
> **From:** David Behring <dbehring@us-concrete.com>
> **Sent:** Wednesday, June 20, 2018 8:56 AM
> **To:** Steve Schmitz <sschmitz@B29Investments.com>
> **Subject:** Re: Message and Letter from last week
>
> Yes sir. Does 2:30 work for you?
>
> Sent from my iPhone

# EXHIBIT

# "F"

Begin forwarded message:

**From:** David Behring <dbehring@us-concrete.com>
**Date:** July 9, 2018 at 10:47:53 AM CDT
**To:** Steve Schmitz <sschmitz@B29Investments.com>
**Subject:** RE: Stark Ranch, Cooke County, TX

Steve,

We believe that the section of the Red River near Thackerville falls under special rules as determined by the Red River Boundary Compact signed in 1999 by Governors Bush and Keating. The method described by Ms. Foster of taking the median point between the vegetation and the floor of riverbank is not what is described in the Boundary Compact.

We continue to believe that we are in the right with our mining program and are mining within the "constant vegetation line" on the southern side of the Red River. The river rises and falls over the sand bars located on the southern side with each rain event upstream, causing the constant vegetation to be further south than Ms. Foster is showing on the documents that you have provided us. Further, what this will really boils down to is a land dispute between the Scott Trust and Stark Ranch. We are mining what we believe to be property of the Scott Trust and have paid them a royalty accordingly. If Stark Ranch would be found to own what has been mined, the royalty would have to be extracted from the Scott Trust in order to pay royalties to Stark.

I have included a summary of the Red River Boundary Compact below for your review.

As I stated to you previously, Redi-Mix has not intentionally trespassed onto Stark Ranch's property. We believe that we are within the boundaries of Scott Trust and have acted with that understanding. It is our intention to be an honorable and friendly neighbor and we are happy to continue this dialog until all of the parties are satisfied.

Sincerely,

*David A. Behring*

Regional Vice President
General Manager
South Central Region



# EXHIBIT "G"



Subject: Fwd: Yarbrough Ranch - Cooke County, TX

Date: 7/18/2018 5:07 PM

From: "Steve Schmitz" <sschmitz@B29Investments.com>

To: "Kelly Bub Smith" <ksmith@B29Investments.com>, "kbiermacher@krcl.com"
<kbiermacher@krcl.com>

Sent from my iPhone

Begin forwarded message:

> From: sschmitz@B29Investments.com
> Date: July 18, 2018 at 5:06:38 PM CDT
> To: dbehring@us-concrete.com
> Subject: Yarbrough Ranch - Cooke County, TX

David,

Thank you for your e-mail. We want to be good neighbors as well, but we respectfully
disagree with your view that the location of the property boundary is further south than
shown on Nedra Foster's survey. We also believe you are not within the boundaries of your
mining agreement with Scott Trust.

After carefully reviewing Nedra Foster's survey, the Red River Compact, and Texas law, we
continue to believe that the southern boundary of the river was altered by your conduct.
Because the boundary line changed as a result of your conduct, Texas law supports our belief
that some of the property north of the natural gradient boundary reflected on Nedra Foster's
survey before you began harvesting sand and gravel is our property. Further, we believe that
your mining activity has clearly surpassed even the current gradient boundary line that is
reflected in Nedra Foster's survey.

We also do not believe that the Red River Compact applies when determining the location of
the property boundary. The text of the Red River Compact itself states that the principal
purpose of the statute is "to establish an identifiable boundary between the states of Texas
and Oklahoma along the Red River... without interfering with or otherwise affecting private
property rights or title to property." The statute was created for political purposes and is not
the governing authority to establish boundaries of private land owners.

Regarding the royalty payments to Scott Trust, the fact that you paid royalties to Scott Trust
for the sand and gravel that you took from our property does not excuse the fact that you
have failed to pay the rightful owner - us. Therefore, it would not be proper for us to seek to
extract royalties from Scott Trust as you suggest.

We would like to suggest scheduling a meeting between you, your surveyor, and lawyer and
me, my surveyor (whose work you have previously seen), and my dirt and gravel lawyer.



These are business types who can hopefully get us to a resolution without going to court.

Please let me know of your availability to schedule that meeting on August 1 (anytime after 10 AM) or August 3 (anytime in the afternoon).

Like you, we share the hope of coming to a prompt mutually negotiated business resolution.

Thank you,

Steve

Sent from my iPhone

# EXHIBIT "H"

| Message | |
|---|---|
| **From:** | Paul Flanagan [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7D45EC666C3D4E4881C900ED9FCEBD72-PFLANAGAN] |
| **Sent:** | 12/9/2017 8:59:06 PM |
| **To:** | David Behring [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=553c178715cb49ab9b385e8bce1dcfb7-dbehring] |
| **Subject:** | Fwd: Texas - Oklahoma |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Dusty Flanagan <dflanagan3@hughes.net>
Date: 12/9/17 1:30 PM (GMT-06:00)
To: Paul Flanagan <pflanagan@us-concrete.com>
Subject: Texas - Oklahoma

# Link to AGFAX   http://agfax.com/2017/11/29/texas-landowners-and-bureau-of-land-management-settle-red-river-dispute/

# Texas Landowners and Bureau of Land Management Settle Red River Dispute



**By Tiffany Lashmet, Texas AgriLife Extension Ag Law Specialist**November 29, 2017

Confidential



*Photo: Texas Agriculture Law Blog*

In November, a settlement was reached in an ongoing dispute between the federal Bureau of Land Management ("BLM") and Texas landowners who own land along the Red River, which separates Texas and Oklahoma. Under the settlement, the parties agree on how the southern boundary of the Red River is to be determined going forward–based on the gradient boundary line, but the current gradient boundary was not specifically identified.

## Factual Background

This case involves a heated dispute between the BLM and Texas landowners with property along the Red River. In the early 2000's, the BLM began re-surveying the land adjacent to the river at the request of the Bureau of Indian Affairs. In 2009, the BLM published updated spot surveys in the Federal Register showing land from the identified medial line of the river to the identified southern boundary to be federally owned.

The BLM took the original position that because the boundary of the river was meant to be "relatively permanent," that the boundary had remained largely the same as it was in the 1920's. Because the river had shifted over the past century, there were portions of now-dry land on the Texas side of the river that still belonged to the federal government, rather than the citizens who claimed ownership.

The landowners had purchased, utilized, and paid property taxes on the land in question for decades. In some cases, the 2009 survey stakes were more than a mile from the current bank of the river.

The lawsuit was filed in 2015 and involved seven families and three counties owning land along the river and involved over 90,000 acres. [Read Complaint here.] The plaintiffs claimed that the BLM committed an "unconstitutional and arbitrary seizure" of their private property.
Specifically, they sought relief under the federal Quiet Title Act, the Declaratory Judgment Act, and alleged violations of the Fourth Amendment and Due Process Clauses of the US Constitution.

Several groups petitioned to join in the lawsuit in support of the landowners, including the State of Texas and the Texas General Land Office, who manages land in the disputed area for the benefit of the Permanent School Fund.

In March 2007, the BLM suspended the 2009 surveys, citing that it "had obtained new information that "brings into question whether the doctrines of erosion, accretion, and avulsion were appropriately considered."

RM004342

The U.S. House of Representatives passed H.R. 428, which directs the BLM to commission a survey to identify the actual and current gradient boundary along the portion of the river at issue. The bill currently remains pending before the U.S. Senate.

## 1923 *Oklahoma v. Texas* Decision

The resolution of this case turns on a 1923 Supreme Court decision in a lawsuit between Oklahoma and Texas. [Read full opinion here.]

In that case, Oklahoma sued Texas claiming that Oklahoma owned the entire Red River bed. The United States intervened in the litigation, claiming it was the federal government, not Oklahoma, who owned the riverbed.

If the Red River was navigable in Oklahoma, then the title would have passed to the state when it was admitted to the union. However, the Court found that no portion of the Red River in Oklahoma was navigable, meaning that the northern portion of the riverbed was owned by Oklahoma, but the portion from the median to the southern bank of the Red River was owned by the United States.

Additionally, the Court established that the Texas boundary is at the south cut bank, or southern gradient boundary of the Red River. "Bank" was defined as "the water-washed and relatively permanent elevation or acclivity at the outer line of the river bed which separates the bed from the adjacent upland, whether valley or hill, and serves to confine the waters within the bed and to preserve the course of the river."

Further, the Court noted that this included "all of the area which is kept practically bare of vegetation by the wash of the waters of the river from year to year in their onward course, although parts of it are left dry for months at a time, and we exclude the lateral valleys, which have the characteristics of relatively fast land and usually are covered by upland grasses and vegetation, although temporarily overflowed in exceptional instances when the river is at flood."

Thus, Texas (or its residents) own the property up to the gradient boundary along the southern bank of the river, while the federal government owns the land between the medial line of the river and the southern gradient boundary.

## 1999 Red River Boundary Compact

Issues of jurisdiction again arose due to the highly transitory nature of the Red River. In 2000, Texas and Oklahoma signed and Congress ratified the Red River Boundary Compact, which established the territorial boundary between Texas and Oklahoma as being the vegetation line along the south cut bank of the Red River.

### Farm Policy News

**Texas: Blackland Income Growth Conference, Waco, Jan. 10-11**
**Farm Bill: Tax Legislation and the Specter of Sequestration**
**Farm Bill Update: Perspective from Chairman Conaway and Chairman Roberts**
**What Is the Impact of Supply Management Programs on U.S. Exports? – Commentary**
**Crop Insurance: Two Senators Target Cuts to Save $21.1Bln – DTN**

Texas was given sovereignty over all lands south of the vegetation line. The parties agreed that the boundary line would move with the "visually identifiable continuous line of vegetation" adjacent to the riverbed.

The Compact did not address any changes of ownership of the land at issue—merely how state boundaries (and therefore state authority) would be determined.

## Settlement

Recently, the parties entered into a settlement agreement, which was approved by the court. [Read settlement here and Order of approval here.

The settlement contained the following key provisions:

- The parties agreed that the northern boundary of private property along the Red River in Wilbarger, Wichita, and Clay counties is governed by the 1923 decision in *Oklahoma v. Texas* based on the gradient boundary methodology.
- The parties agreed that the geographic location of this boundary may change over time, for instance, based on principles of erosion or accretion. Where the boundary bank changes, the boundary—public or private—follows the change.
- The parties agreed "that the south bank of the Red River is the water-washed and relatively permanent elevation or acclivity at the outer line of the river bed…"

Confidential

- As noted above, the BLM has suspended the surveys conducted at the request of the Bureau of Indian Affairs based on the belief that the "survey methodology was in error" because the surveyor did not account for erosion, accretion, and avulsion. Per the Settlement Agreement, the BLM will cancel those field notes and plats related to these surveys.
- BLM will disclaim the June 2014 map that represents the BLM's boundary determination at issue.

## Take Aways

This case was heatedly debated and closely watched across the country. Interestingly, although the case has settled the current issues for the parties involved related to the 2009 surveys, there are several questions the Settlement Agreement does not answer.

It does not, for example, actually determine any boundaries to the ownership of land along the Red River. It does not identify the current location of the gradient boundary line. It does not state who would have the burden of proving the location of the gradient boundary line–landowners or the BLM–should additional legal disputes arise.

Instead, it only determines the legal standards that will be used to determine the location of the boundaries. Thus, the BLM could initiate new surveys of ownership, so long as those surveys follow the procedures and standards set forth in the Settlement Agreement. Thus, in the event that the BLM was to conduct another survey, if landowners disagreed with the methodology or results, another lawsuit could certainly arise.

This message was sent from a non U.S. Concrete email server.

Confidential

RM004344